**L. G. HAMMOND v. A. B. CURRY, as City Manager of the City of Miami, et al.**

14 So. (2nd) 390        June Term, 1943
June 29, 1943        En Banc
Rehearing Denied July 24, 1943

*E. F. P. Brigham,* for appellant.

*J. W. Watson, Jr., Sidney S. Hoehl* and *Franklin Parson,* for appellees.

THOMAS, J.:

L. G. Hammond, ousted police officer of the City of Miami, filed a petition for writ of mandamus against the city, and A. B. Curry in his capacities as city manager and as director of public safety. Attached to the pleading were copies of the letter of suspension executed by the chief of police, the order of dismissal entered by the director of public safety and the record of the testimony introduced before the latter. An alternative writ issued commanding the cancellation of the order of discharge and reinstatement of the petitioner. Then, on motion to quash, judgment was entered for the respondents.

The circuit judge found from the exhibits accompanying the petition that no irregularity occurred in the preferment of charges by the chief of police, the opportunity afforded the petitioner to refute them, or the hearing conducted by the director of public safety. He observed "that jurisdictional facts existed as a basis of the suspension and removal . . . that the Director of Public Safety acquired jurisdiction . . . *and under such facts and circumstances the Circuit Court should not substitute its judgment for that of the Director of Public Safety as provided under the Charter of the City of Miami."* (Italics supplied by us). This statement was preceded by the quotation of Section 25, of the city charter (Chapter 10847, Laws of Florida, Special Acts of 1925, as amended). The portion of that section pertinent to a decision in this case follows: "The Chief of Police . . . shall have . . . power to suspend any of the officers . . . under [his] management and control for incompetence, neglect of duty, immorality, drunkenness, failure to obey orders . . . or for any other just and reasonable cause. If an officer . . . be suspended . . . the chief . . . shall forthwith . . . certify the fact together with the cause for suspension, to the Director of Public Safety, who shall, after hearing, render judgment thereon, which judgment, if the charges be sustained, may be a reprimand, fine, suspension, reduction in rank or dismissal, *and in every case shall be final."* (In the opinion the judge underscored the last clause.)

As authority for his views the judge cited our decision in

Bryand v. Landis, 106 Fla. 19, 142 So. 650, 653. It was held there that if a suspension and removal of the Chief of Police of the City of Miami were made in compliance with provisions of the city charter by the city manager and city commission their action was not subject to review but that the court would examine the "jurisdictional facts" forming the "basis for exercising the power of suspension and removal." The decision was based on the ruling in State ex rel. Hatton v. Joughin, 103 Fla. 877, 138 So. 392, where the suspension of an officer by the Governor was under consideration.

In a recent case, Nelson v. Lindsey, Fla., 10 So. (2nd) 131, 135, decided within the year, this Court held that a member of the police force in Miami was entitled to mandamus to determine whether he had been properly disciplined and, in arriving at the conclusion that he had not, examined fully the entire record in the cause, including the evidence relevant to the charges. The judgment reversed the circuit court which had decided that the charges had been sustained by the evidence and, incidentally, that it could not "substitute [its] judgment for that of those vested with the administrative powers by the City Charter."

We are not unaware of the rule found in some of the earlier cases, notably, State ex rel. Lamar v. Johnson, 30 Fla. 433, 11 So. 845, restricting the power of the court in its examination into proceedings for the removal of officials, however, the rule has been relaxed to the extent that the courts will explore the record to determine whether there is any evidence to substantiate the charges. We do not have the idea, suggested by the judge's observation, that because the order of the director is, according to the phraseology of the charter provision, final, there can be no judicial review of the sufficiency of evidence to support it. We may determine whether there has been "a legal and reasonable exercise of administrative judgment predicated upon required procedure and appropriate evidence as shown by the record as made," or whether there has been an "abuse of delegated authority or arbitrary or unreasonable action." Nelson v. Lindsey, supra.

There is no need for us to discuss the procedure from the

time the charges were lodged by the chief of police until the judge entered judgment in the case in mandamus, but we will examine the testimony forming the foundation of those charges in order that it may be determined whether there was any evidence justifying the removal of the police officer. Although we will not attempt to reconcile the conflicting testimony or choose that which we think more worthy of belief we will not be precluded from deciding whether the relator has been deprived of a valuable right simply because the charges on their face state cause for removal and the chief of police and director of public safety tracked the law in presenting and disposing of them. It seems to us that any other course would be improper. A contrary view would make possible a suspension or removal, and the consequent loss of a valuable right, without judicial interference upon charges apparently regular, even though the evidence contained nothing to substantiate misconduct.

We will proceed to an exploration of the evidence in a light unfavorable to the suspended officer and decide in that manner whether his dismissal was justified.

He was a member of the vice squad and worked in civilian clothes. Miami had become an important area for the training of men in the armed services. The commander of the naval district, in which the city was situated, insisted that the region be rid of prostitutes, whereupon, the vice squad was given orders "to run [them] out of town." The sergeant in charge of this group received a report that a woman was soliciting on a certain street corner and he, on two occasions, made an effort to locate her from a description which had been given him. The informant told him that the woman was suffering from a venereal disease. The sergeant communicated the complaint and the description to the relator and ordered the latter to watch for the suspect. While obeying these instructions he observed a woman fitting the description walking along a prominent street, in the late evening. There followed an experience which was unquestionably humiliating to her and, in its later development, injurious to him.

Their versions of the affair differ sharply but we will give

her's briefly as she narrated it in the hearing. She had left the theatre in the evening and proceeded to Biscayne Boulevard on her way to a restaurant managed by one of her acquaintances. Upon reaching Biscayne Boulevard she discovered that a man was following her and later he engaged her in conversation, remarking that he had been looking for a girl, but had found none. He said, "You know . . . all the houses are closed." He offered to buy her food and drink which she refused and the conversation continued until she was in front of the cafe which was her original destination. She said she looked in the window and saw that her friend was busy, whereupon, they turned and walked down the street. Eventually she and the man entered a place where fruit juices were served and he then showed her his badge of authority. It appears from her evidence that she was annoyed while this desultory conversation was taking place, but became really aroused when she learned that her unwelcome companion was an officer of the law. A considerable period of time elapsed from their first meeting until he revealed his identity; meanwhile, they had traveled together a distance of ten or eleven city blocks. Admittedly she was unafraid. There were crowds of people upon the sidewalks. She made no outcry and called no uniformed officer or other person to relieve her of the annoyance. She had worked two years at the traffic court, a branch of the police department in the city of Detroit, hence was probably not unfamiliar with police customs. During her residence in Miami she had served as a waitress at four restaurants.

When the officer informed her that it would be necessary for her to go to the police station she became infuriated and repeatedly refused to give her identity. The degree of her anger may be measured by her act in striking the officer at the police station and by the epithets she applied to him there and later at the hearing before the director of public safety. At the hearing she referred to him as a "rattlesnake," and, by her own admission, she termed him a "rat" and a "louse" the night of the arrest.

It is significant that the remark about his looking for a girl and about the houses being closed, relied upon as con-

stituting an indecent proposal apropos the charges which we will eventually analyze, was said by her to have been made when their stroll along Biscayne Boulevard had just commenced.

On these facts the chief of police preferred charges against relator for (1) conducting himself in a manner unbecoming an officer by making "indecent and lewd proposals" to a woman; (2) exceeding authority by placing her under arrest; (3) grossly neglecting duty because after the arrest and the discovery that she was not a prostitute he "failed to bring about her release;" and (4) conducting himself in a manner unbecoming an officer because after receiving information that she "was a young woman of good character and reputation and could not have been a prostitute" he charged her, in a written statement, with being one and stated if she would be willing to leave the city she would be released from custody. She may have been annoyed by his presence but she did not, as we have already pointed out, become really offended at anything he said or did until a considerable time had passed and he had revealed that he was a member of the police force. Opportunities were offered her to escape or report the annoyance because they passed police officers in uniform and there were numerous passersby. At the restaurant where her friend was employed it would have been possible for her to have found refuge or to have telephoned the incident to police headquarters. She evidently made no complaint and sought no aid until she learned that her companion was, himself, an officer of the law.

It is equally difficult to construe her description of the affair to support the charge that he exceeded his authority. In view of the insistance of the naval commander that questionable women be eliminated from the area where the men were being trained and the explicit instructions of the officer's superior to be on the alert for a person whose description she answered we think he was amply warranted in questioning her. She could have readily obviated any humiliation or embarrassment if she had cooperated to the extent of establishing her identity. She chose to resist any effort on the part of the officers to learn her name and her residence until

long after she had been taken to the police station and, in the interim, gave vent to her temper by slapping the officer and applying to him opprobrious epithets.

It was next charged, discussing the formal accusations in order, that he neglected his duty when he didn't bring about her release from custody after he learned finally her name and address and interrogated her landlady. This accusation was totally unsupported by the evidence. After she was placed under arrest and transported to the police station her behavior in striking the officer and using the epithets we have quoted justified the charge of disorderly conduct, upon which she was eventually tried in police court, irrespective of any information that the relator may have gained about her character.

The remaining charge which the city undertook to prove was his misconduct in accusing her of being a prostitute and proposing that if she would be "willing to leave the City of Miami, she should be released from custody." Gravamen of this charge was classifying the woman as a prostitute and asking her to leave town *after* relator discovered that her reputation was good and that she could not have been one.

We shall pause here to say that it was the City's burden to prove this charge, as well as the others, by a preponderance of the evidence. The document on which the city relied to substantiate the last accusation was a report addressed to the police department giving details of the arrest and containing the statement "Check her through the Clinic and if she is clean and not diseased and is willing to leave town we will not prosecute." It was titled "Investigation Arrest Report," was prepared by a brother officer, and bore his name and relator's. No where in it do we find the direct charge that the woman was a prostitute although the paper does contain the statement with reference to leaving the City. We are not advised, however, that when this paper was actually prepared it had been established that she did not and could not fall in that category. It is important to recall, in this connection, the instructions given by the sergeant and the vice squad to the relator that the woman whose description coincided with hers should be apprehended because diseased.

Taking into account this order from a superior officer and the purpose intended by its execution we cannot conceive how a report by the relator to the department to which he owed allegiance, indicating obedience to that order, could form just cause for discharge.

Without doubt the young woman who was arrested suffered great humiliation. We have studiously avoided using her name in this opinion because we do not wish to add to her embarrassment. Unquestionably a mistake was made, however, we do not find that there was any intent on the part of the officer to accost the young woman except in his efforts to obey the instructions given him. There is nothing to establish that he was a rake or roué.

Our conviction from a perusal of the record is that, irrespective of any liability on the part of the City to the young woman who was falsely accused, there has been a failure to establish the patrolman's guilt of any greater wrong than an error in judgment and that he should not have suffered the ignominy of dismissal from the police force.

The judgment is reversed with instructions to enter the peremptory writ unless the appellees apply within fifteen days for, and are granted, leave to file an answer presenting a defense not concluded by this appeal.

TERRELL, CHAPMAN and ADAMS, JJ., concur.

BUFORD, C. J., BROWN and SEBRING, J., dissent.

BUFORD, C. J., dissenting:

Officer L. G. Hammond was found guilty by the Director of Public Safety and dismissed and discharged from the service of the City on four charges preferred by the Chief of Police in writing, as follows:

"(1) You were guilty of conduct unbecoming an officer of the Division of Police in that on Saturday night, May 9, 1942, between the hours of 9:30 P.M. and 11:30 P.M., at one or more places on Biscayne Boulevard between N.E. 5th Street and East Flagler Street and at one or more places on East Flagler Street between Biscayne Boulevard and N. E. 2nd Avenue, Miami, Florida, you made without just cause or provocation indecent and lewd proposals to one . . . and

molested and continued to molest and to make such indecent and lewd proposals to said . . . without just cause or provocation.

"(2) You exceeded your authority as a police officer in the Division of Police in that you placed said . . . under arrest without just cause or provocation on Saturday, May 9, 1942, at or about 11:30 o'clock P.M., at or near the intersection of N.E. 2nd Avenue and Flagler Street in the City of Miami, Florida.

"(3) You were guilty of gross neglect of your duty as a police officer in the Division of Police in that after bringing about the arrest of said . . . as hereinbefore described, you made an investigation into her character and reputation, and, although you were informed that said . . . was a young woman of good character and reputation and could not have been a prostitute, for which reason you had placed her under arrest, you took no action to bring about her release from custody but continued to prosecute her in the Municipal Court of the City of Miami without just cause or provocation.

"(4) You were guilty of conduct unbecoming an officer of the Division of Police in that subsequent to the arrest of said . . . at or about 11:30 P.M. on May 9th, 1942, as hereinabove set forth, and subsequent to your investigation into her character and reputation, as hereinbefore set forth, you wrote a statement which charged said . . . with being a prostitute and which stated that if she would be willing to leave the City of Miami she should be released from custody."

My construction of the statutes referred to in the majority opinion prepared by Mr. Justice Thomas and of the decisions of this Court therein cited, leads me to the conclusion that there is no conflict between the enunciations in the Nelson case and those in the Bryan case and others of like import which were cited in the Bryan case. As I construe these opinions and judgments, we have uniformly held that "Jurisdictional *facts*" must be shown and not that allegations of "jurisdictional cause" *only* is required. Nelson v. Lindsey, 10 So. (2nd) 131, 151 Fla. 596; Bryan v. Landis ex rel. Reave, 142 So. 650, 106 Fla. 19; State v. Joughin, 138 So. 392, 103 Fla. 877;

There is a vast difference between the two propositions. If the establishments of jurisdictional facts rests upon conflicting evidence, then the courts may not weigh the probative force pro and con of such evidence, but if there is an utter failure to allege jurisdictional cause or an utter failure to prove the alleged conduct which would establish the required jurisdictional facts, the courts may so determine. Gretton v. City of Pittsburg, 25A 2d 351, 344 Pa. 219; Singer v. Graves, 4 N.Y.S. (2nd) 318, 254 App. Div. 37; Gipner v. State Civil Service Comm. of Cal., 56 P(2d) 535, 13 2d Cal. App. 100; 43 C.J. Secs. 1366, 1367, 1374 46 C.J. Secs. 173, 174; 19 R.C.L. Sec. 233.

The very purpose of the establishment of civil service regulations by statute is to protect officers and employees from demotion, suspension or removal, except for specified cause after not *only* written sufficient charge with the opportunity granted to be heard but *also only after proof* of such charges. Jurisdictional facts are not established until a charge of misconduct sufficient to constitute jurisdictional cause is made and the charge so made is proved by some substantial evidence or admitted to be true. Garvin v. Chambers, 232 P. 696, 195 Cal. 212; Anderson v. Bd. of Civil Service Comm'rs. of Des Moines, 290 N.W. 493; 227 Iowa 1164, 127 A.L.R. 489; Howard v. Bell County Bd. of Education, 57 S.W. (2nd) 466, 247 Ky. 586.

The courts, when properly appealed to, may review the record to determine whether or not jurisdictional facts are made to appear therefrom and if on review it appears that jurisdictional cause is alleged then due process of law has been observed, and if the proof submitted may reasonably be construed to establish the truth of the jurisdictional allegations, then the jurisdictional facts appear to be present and the court may go no further. Bryan v. Landis, supra; State ex rel. Nelson v. Henry, 266 N.W. 227; 221 Wis. 127; Coane v. Geary, 18 N.E. (2nd) 719; 298 Ill. App. 199; 43 C.J. Sec. 1130.

The rights to such review by the courts arises because of the existence and application of the Civil Service Statutes. Were the rights and duties not fixed by statute, the courts would be without jurisdiction to review or grant relief, be-

cause then the municipality could fix and enforce its own rules and regulations in regard to hiring and discharging employees.

We certainly do not fall short of rendering highest regard for pure womanhood, but here we are dealing with the discharge of duty by a police officer and not with the defense of feminine virtue. This must be true because all people are equal before the law and are entitled to like protection of the law.

This police officer was charged with the specific duty of apprehending a woman who was plying the trade of a prostitute. The description given him by his superior officer of the woman whom he was ordered to apprehend was completely and in minutest detail reflected in the young woman accosted. Her appearance and her conduct as reflected by the record before us, without contradiction, was such as to have caused any careful and experienced officer to believe that she was the woman whom his superior officer had directed him to apprehend.

If this officer had been given as minute a description of bank robber and had contacted a man who as fully fitted that description as this woman did the description of the prostitute whom he was directed to apprehend, and that man so contacted had refused to give any information about himself as this woman did refuse to do, the officer certainly would have been justified in pursuing such course as would appear to a prudent officer reasonably necessary to determine whether or not the man so contacted was in fact the robber.

We, after careful consideration of the record, are unable to find any material evidence to support the charges (1) and (2).

Charges (3) and (4), however, find some support in the record tending to prove the allegation of fact contained in those charges, and upon such evidence it became the duty of the Director of Public Safety to determine whether or not the action of the police officer in this regard was without just cause or provocation; in the exercise of the discretion vested in the Director of Public Safety he not only determined and adjudged that the police officer was guilty of doing things

alleged in those two charges, but also determined that the police officer did those things without just cause or provocation.

The burden was then upon the petitioner in the court below to clearly show that the Director of Public Safety in reaching and pronouncing the judgment abused his discretion.

The Court cannot reach the conclusion that the officer vested with the exercise of discretion has abused that discretion merely because the Court, on consideration of the record, would have reached a different conclusion. See cases last cited, supra.

It is elementary that this Court should not reverse the court below unless it is made clearly to appear that the court below committed error. The appellant has not carried that burden in regard to the judgment entered on charges (3) and (4).

For these reasons we think the judgment should be affirmed.

BROWN and SEBRING, J.J., concur in conclusion.