CHARLES O. NELSON, v. STATE OF FLORIDA, ex rel., H. LESLIE QUIGG.

23 So. (2nd) 136                                                June Term, 1945
July 24, 1945                                                   En Banc
Rehearing denied September 10, 1945.

*J. W. Watson, Jr., Franklin Parson* and *John M. Murrell,* for appellant.

*G. A. Worley* and *Jack Kehoe* and *E. F. P. Brigham,* for appellee.

HOBSON, Circuit Judge:

This case had its inception strictly as a judicial proceed-·ing in the Circuit Court of the 11th Judicial Circuit in an action initiated by the filing of an information in quo warranto in the name of the State of Florida on relation of H. Leslie Quigg, relator, and against Charles O. Nelson, respondent. Its true genesis, however, was in a hearing before the City Commission of the City of Miami. This hearing was inaugurated by the City Manager and had as its purpose the determination, as a matter of fact, of whether the charges filed against Quigg, the then Chief of Police of Miami, were true and required Quigg's removal from office. The City Charter of Miami authorizes such action and prescribes the procedure to be ·followed. We find that there was a legally sufficient compliance with statutory requirements in every particular in connection with the hearing before the City Commission. As a result of this full and complete hearing, the City Commission removed Mr. Quigg from the office of Chief of Police. Thereafter Charles O. Nelson was installed as Quigg's successor. The Circuit Judge in effect reversed the action of the City Commission by the entry of a judgment of ouster against the respondent Nelson in the quo warranto proceedings.

Many questions have been posed for our consideration and to aid us in a proper determination of this controversy. We deem it sufficient to say that the answer to one of these questions is determinative of the case. As to all other assignments of error and questions presented, we find, upon an examination of the entire record, no harmful or prejudicial error.

The question which is determinative of this case on appeal (and it was before the Circuit Court in a proceeding in the nature of an appeal) may be stated in more than one form. We prefer to pose the query in the following verbiage—does a consideration of the record in its entirety disclose the ruling of the CityCommission to be sustained by substantial evidence? We have held, and it seems to be an almost universal rule, that the findings of fact made by an administrative board, bureau, or commission, in compliance with law, will not be disturbed on appeal if such findings are sustained by substantial evidence. (Hammond, L. G. v. City of Miami, Fla. 153 Fla. 245, 14 So. (2nd) 390; Jenkins v. Curry, City Manager et al., 18 So. (2nd) 521; Callahan v. A. B. Curry, 153 Fla. 739, 15 So. (2nd) 668; Marshall v. Pletz, 317 US 383, 63 S. Ct. 284, 67 L. ed 348; Virginia Electric & P. Co. v. National Labor Rel. Bd., 319 US 533, 63 S. Ct. 1214, 87 L ed 1568). The underlying and salient reasons for this safe and sane rule need not be repeated here. The fact that it is not the province of an appellate court to try cases de novo on a cold typed transcript is too elementary to require emphasis. This rule finds its counterpart in, if indeed it is not the twin brother of, the rule which requires an appellate court to give great weight to the findings of fact made by a jury or a chancellor and to sustain such findings unless there is no substantial evidence to support them. (See Broxson v. State, 99 Fla. 1187, 128 So. 628; Smith v. Midcoast Inv. Co., 127 Fla. 455, 173 So. 348; Marcus v. Hull, 142 Fla. 406, 195 So. 170).

The rule invoked herein is salutary and founded in good common sense and irrefutable logic. It should be adhered to religiously. The advent of the talking moving picture probably has given us a preview of a sound reason for its ultimate abolition. However, until this possible avenue of

escape has been made adaptable to, and a requirement in, judicial proceedings, the rule should remain inviolate.

Upon a careful consideration of the complete record, we find the the ruling of the City Commission is sustained by substantial evidence. It was the failure of the learned Circuit Judge to apply the rule which we invoke herein which caused him to fall into error. It is not difficult, however, to understand how a Circuit Judge, whose daily work is predominantly fact finding in character, might easily overlook this rule.

It is unnecessary to a proper determination of this controversy to detail the evidence which was before the City Commission. It is appropriate, nevertheless, at this moment, when the members of our armed forces dice with death on the far-flung battle fronts and our form of government, indeed our very existence, is being challenged by a large portion of the peoples of the earth, to refer as briefly as possible to the unbelievable situation which developed and was attendant upon the Miami bus drivers' unwarranted, unofficial and unlawful strike. This incident, coupled with its ramifications as disclosed by the evidence, presented ample justification for the ruling made by the City Commission. The congregation of buses about the Court House in downtown Miami, which was brought about by the unauthorized orders and directions of certain leaders of the bus drivers' union, created a figurative coronary thrombosis at the very heart of the metropolitan area. All parties to this controversy agree that a grave situation existed. Counsel for Quigg contend that he exercised his discretion and best judgment and should not have been removed even if his course had not been productive of satisfactory results. This was Quigg's position before the City Commission.

But what course of conduct did Chief Quigg pursue? At the time of this strike he was the principal law enforcement officer of the City of Miami. Almost without exception every child of school age in America knows what the words "law enforcement officer" mean—one invested with the authority and charged with the duty to enforce the law. It is that simple. No one denied the fact that multiple city ordinances were violated right and left by the bus drivers at the volun-

tary direction of the union leaders, particularly one Frazier. That such violations were known to the chief is not challenged and could not be consistently denied. No one with the normal human senses could have unwittingly overlooked them. But if he did so overlook them, he can find no comfort in that fact. Thereby his incompetence would have been clearly established.

During this strike, according to Quigg's own testimony, he could have called to his assistance three hundred sixty-eight policemen within fifteen to forty-five minutes. In addition, a change of police shifts took place at which time the outgoing police as well as the incoming ones could have been held and their combined number would have been sufficient to have eliminated at least the serious traffic hazard with its attendant grave potentialities.

In the face of this situation, the chief took only one step which even he might fairly consider affirmative conduct in line of duty. To one of his subordinates he said, "Keep cool and calm and keep the line of traffic open, if possible." To the Court this statement speaks for itself. It was more in the nature of an aside remark than a forceful command or direction. Moreover, the record fails to show either any serious effort to perform his duties or any proximate accomplishment thereof. Quigg was either incompetent, as aforementioned, or deliberate in the avoidance of his immediate duties. It appears that all the rest of his time and energies were devoted, not to law enforcement or official duties, but to a course of conduct prescribed, required and demanded by the leaders of the bus drivers' union. His conduct can be best described by the word which has become known and accepted universally as a synonym for the surname Chamberlain.

Fault is not to be found so much with the Chief because he assisted in securing the release on bond of a bus driver who had been incarcerated lawfully, an act which to the most fantastic mind does not come within the purview of his official duties, but rather that he failed to perform his duties and became an appeaser to the extent that he knuckled under to the intimidating demands and requirements of those whose

conduct evidenced the fact that they would supplant law and order with mob violence. Law enforcement officers cannot be so intimidated, cowed, overawed and swayed from their paths of duty if we are to preserve—that which throughout one hundred sixty-eight years of our national existence we, a body of free people, have fought, bled and died to preserve— the quasi Utopian dream of our forefathers which we now so proudly and popularly term "the American way of life."

The judgment of ouster should be, and it is hereby reversed.

CHAPMAN, C. J., TERRELL, BROWN, BUFORD, SEBRING, JJ., and SANDLER, Circuit Judge, concur.

SANDLER, Circuit Judge, concurring:

I concur in the opinion prepared by Judge Hobson. While this cause originated in the Circuit Court for the Eleventh Judicial Circuit, nevertheless, it brought for review and not for retrial the proceedings before the City Commission. It was not the province of the Circuit Court to retry the case on the record and substitute its judgment for the judgment of the City Commission, but it was the duty of the Circuit Court to review the proceedings to determine if the jurisdictional requirements were complied with and if the judgment of the City Commission found support in the record. That was the question there and is likewise the question here.

There were nine charges filed against the Chief of Police, two of which were quashed, he was acquitted on three and found guilty on four. The charges on which the Chief of Police was convicted, accused him of neglect of duty by reason of his neglect and failure to enforce the ordinances of the City of Miami and Criminal Statutes of the State of Florida; failure to bring about the apprehension, arrest and punishment of the persons who violated the said ordinances and statutes at and during the time of the strike by the bus drivers in the City on the night of March 29, 1944, and incompetence, as Chief of Police, by reason of the fact, that he had permitted the police department to fall into a state of disorganization, disunity, discord and inefficiency.

The defense in this case may be best summed up by the testimony of the Chief of Police himself, when he testified,

"I didn't see anybody violate the law, and I didn't see anybody—I saw laws violated, cars parked after they were violated, so I didn't do anything." . . . "The action I took I thought was best, because it was discretionary. I had the discretionary powers to use my best judgment in case of an emergency and I thought the easiest was the best, which proved to be."

With eighty-three buses congregated around the City Hall about ten o'clock at night, instead of complying with his oath of office to enforce the ordinances and the statutes, the Chief took the easiest way out and permitted the bus drivers to take over, one of whom in response to a question inquiring as to the nature of the trouble replied,

"The main issue is: who is the biggest—the City Court Judge or 600 bus drivers."

There are times when discretion may be the better part of valor, but never at the expense of law and order.

When a government of men is substituted for a government of law liberty disappears and tyranny prevails. History now in the making has so clearly demonstrated this as to make comment unnecessary.

A careful study of the voluminous record in this case convinces me that not only is there substantial evidence in the record to support the findings and judgment of the City Commission, but that its judgment is entirely consistent therewith.