**ROSE EDITH OGDEN, also known as HAYDEE ROSA OGDEN, v. CLEMENT MOORE OGDEN, also known as FRANCIS CLEMENT MOORE OGDEN.**

33 So. (2nd) 870          June Term, 1947
August 1, 1947          En Banc
Rehearing denied February 13, 1948

*Evans, Mershon, Sawyer, Johnston & Simmons, Herbert S. Sawyer* and *W. O. Mehrtens,* for appellant.

*Robert L. Graham, Jr., Redfearn & Ferrell* and *D. H. Redfearn,* for appellee.

PER CURIAM:

The record and the briefs in this cause have been examined. We are not convinced that reversible error was committed so the judgment is affirmed.

Affirmed.

TERRELL, BUFORD, CHAPMAN and ADAMS, JJ., and PARKS, Associate Justice, concur.

THOMAS, C. J., dissents.

BARNS, J., not participating.

ON PETITION FOR REHEARING

TERRELL, J.:

Appellee, Clement Moore Ogden was born in Paris in 1894 of wealthy American parents who spent a great deal of time in Europe, died and were buried in England but never applied

for citizenship there or surrendered their citizenship in this country. Clement Moore Ogden was educated in England and has spent most of his life in Europe but has never surrendered his citizenship in the United States. In 1924 he married a French lady at Cannes. To this union a son, David, was born and soon thereafter the marriage was severed by divorce. In 1930 he married the appellant, Rose Edith Ogden, at Cannes, to which union a daughter, Patricia, was born in Switzerland in 1931. Rose Edith Ogden was born in Argentina, but like appellee, has spent most of her life in Europe.

Appellant and appellee lived together as man and wife at different places in Europe and made irregular visits to this country during their married life. In 1939 they bought a house in England and were having it reconditioned when appellee was required to return to this country, because World War Two had broken out and all citizens of the United States were advised by our Ambassador at London to return home. Appellee alleges that he made all arrangements to return to this country with his family and secured transportation for each of them, but at the last moment appellant refused to accompany him or to permit Patricia to return with him. Appellee returned to New York with his son in May 1940, where he resumed his domicile.

He continued to reside in New York till November 1944, when he removed to Florida and established his domicile at Hollywood for the purpose of improving his health, so he alleges. Repeated attempts to get appellant to join him in this country and resume their family relations failed, so in February 1945 he instituted this suit for divorce based on desertion. Defendant answered the bill with a motion to dismiss and a counterclaim for alimony and suit money. Prior to the institution of Ogden's suit for divorce in Florida Mrs. Ogden brought a suit in the High Court of Justice in England against Ogden to restore her conjugal rights. The judgment secured in that case was the predicate for Mrs. Ogden's motion to dismiss Ogden's bill for divorce in Florida. On final hearing the plaintiff's prayer for divorce was granted, defendant's motion to dismiss was overruled and her prayer for relief by counterclaim was denied. This appeal is from the final decree.

On first consideration the judgment appealed from was affirmed without opinion but on petition for rehearing we are urged to review and reverse that portion of the order of affirmance in so far as applicable to Mrs. Ogden's motion to dismiss. The effect of overruling the motion to dismiss was tantamount to refusal of the chancellor to apply the rule of comity to the judgment of the High Court of Justice in England secured by Mrs. Ogden in her suit, to restore conjugal rights. We are also urged to render a written opinion because the question is one of first impression in this State.

By factual allegation appellant has very thoroughly presented four questions for our consideration but we think all of them may be resolved into two essential questions, to-wit: (1) Did Ogden properly raise and prove his charge of desertion, and (2) Under the rule of international comity, sometimes called the rule of reciprocity, did the chancellor commit error in refusing to hold that the judgment of the High Court of Justice of England in the suit brought in that country by Mrs. Ogden against her husband for restitution of conjugal rights, was res adjudicata as to the question of desertion in this case. The English decree found Ogden guilty of deserting Mrs. Ogden and ordered him to pay her two thousand pounds per year alimony.

As heretofore recited, the second question is the one on which the rehearing is sought and to which this opinion will be primarily directed. If this question required an affirmative answer, it would necessarily settle the first question in favor of Mrs. Ogden, but since we think it requires a negative answer, it is not out of place to state that we have carefully re-examined the evidence in support of both questions, and we think there is ample evidence to support the charge of desertion. This does not imply that there are not sharp conflicts in the evidence, but the chancellor believed the complainant's version of the affair and the record is sufficiently convincing that we could not reverse the chancellor without substituting our judgment for his, which we are not permitted to do.

On the point of whether or not under the rule of international comity the chancellor committed error in his refusal to give the effect of res adjudicata to the judgment of the High

Court of Justice òf England in the suit for restitution of.con-jugal rights, the general rule is that the judgments of a foreign court will be given force and effect and will be enforced only when the courts of the jurisdiction where the cause first arose would afford relief under the same circumstances to the judgments of the forum. Applying the rule to this case, we have the query, would an English Court recognize and give effect to a Florida decree against an English subject secured under like circumstances as the English Court decree offered for enforcement here?

Appellant instituted her suit for restoration of conjugal rights in the High Court of Justice in England in 1941. Notice of this suit was served on appellee in New York, October 29, 1941. Appellee filed an affidavit to be used exclusively as evidence at the trial, raising the point of jurisdiction of his person. When the cause came on to be heard, the English Court dismissed the issue of jurisdiction and held the appearance to be general, on the ground that appellee had failed to comply with the court's order requiring costs and security. The order in other words, shows on its face that the question of appellee's domicile, as affecting jurisdiction of his person, was not adjudicated by the English Court..

Mrs. Ogden's primary reliance to overcome Ogden's charge of desertion with the plea of res adjudicata in the case at bar, is on the pleadings and order entered by the English Court in her suit to restore conjugal rights. Despite the fact that Mr. Ogden then claimed and has always claimed, the United States as his domicile, his plea raising that point was dismissed without a chance to meet the issue on the merits and litigate the question of domicile. On August 14, 1944, the original order was amended to require Mr. Ogden to pay Mrs. Ogden two thousand pounds per annum as alimony, "until further order" of the English Court.

It may be that such an order is binding under English practice, but we do not think it attains the dignity of an order or decree that the Courts of this State are required to enforce under the rule of international comity. In the first place, it is not a final decree of the English Court. Mr. Ogden was not an English subject and the courts of that country did not ac-

quire jurisdiction of his person. He claimed his domicile in this country, he positively denied English domicile, and when advised by the American Ambassador to leave that country he immediately made preparations to do so, and did in fact come to the United States where he had remained to this date. He inherited a sizable fortune in the State of New York from his father, which he still owns, he pays taxes there, his living comes from there, and every indicia of his citizenship points to New York as his legal domicile. It is quite true that the major portion of his life has been spent in England and on the continent, but he had lived in hotels, rented houses and flats and had expressed no purpose to become an English subject. He was a man without a profession, trade or job, and, so far as the record discloses, spent his time in Europe for lack of incentive to appropriate it to something more laudable.

After all, the best proof of one's domicile is where he says it is. If the place he claims for it is challenged, the law of this country permits him to meet the challenge before a judgment against him becomes final. The evidence taken on the point in England shows that Ogden's domicile was a question for the courts of this country to decide. The expert testimony of English barristers on the point shows that the decree for restitution of conjugal rights was good in England, but that its extra-territoriality was a matter for the American Courts to decide. We have previously shown that Ogden entered a special appearance and made an issue on the point of domicile, but his appearance was dismissed because of Ogden's failure to pay costs, so the issue of domicile has not yet been litigated.

In fine, we construe the net effect of the expert testimony to be that the order of the English Court in the suit to restore conjugal rights, if issued in a foreign country, would not be given effect in England because it was not final judgment. We do not understand the rule of international comity to require the courts of this country to recognize and give effect to the judgments of an English Court that are not final. If permitted to reason by analogy, it may be said that such is the effect of the full faith and credit clause of the constitution of the United States as to judgments of other States. Section 1,

Article IV, Federal Constitution; Barber v. Barber; 323 U.S. 77, 89 L. Ed. 82, 65 Sup. Ct. 137, 157 A.L.R. 163; Lechner v. Lechner, 154 Fla. 114, 16 So. (2nd) 816; Meister v. Day, 20 Ohio, App. 224, 151 N.E. 786. In briefs of counsel great reliance is placed on the charge that the English judgment is not final but in our view that is not material here.

Appellant contends that the judgment in the High Court of Justice of England restoring her conjugal rights, is shown by the evidence of eminent English barristers, to be conclusive and binding on Ogden as to the question of desertion, and under the law of International Comity, is a bar to litigating the question of desertion in the courts of Florida. Appellant further contends by the same token, that the High Court of Justice of England had jurisdiction of the subject matter litigated there, because both parties had been resident of England, where cohabitation ceased and that Ogden's actual domicile in England was not essential to give the courts of that country jurisdiction of the subject matter.

We do not challenge the content of the foregoing paragraph as being a correct statement of the law of England, but if it is, then the very predicate on which the judgment for restoration of conjugal rights is laid, is such that it should not be recognized and enforced in this state under the law of international comity. To actuate the doctrine of judicial comity or reciprocity, the foreign judgment must partake of the elements that would support it if procured in this country. Parker v. Parker, 155 Fla. 635, 21 So. (2nd) 141. If this is a correct statement of the law of England, a judgment secured thereby is charged with deficiencies that would lift it out of the class rigidly entitled to international reciprocity. In other words, if the question of desertion can be determined in England without securing jurisdiction of the defendant, and if the question of his domicile is not material to that determination, then jurisdiction and due process under English law is so different from what we understand it to be in this country, and what our law requires to support it, that a judgment secured there in a case like this would not be recognized and enforced in Florida on the basis of international comity. Jurisdiction of the parties is the first prerequisite to a valid

judgment in this country and it makes no difference whether the parties are lounge lizards or the highest ranking citizens.

Under the constitution and law of this state, when divorce and alimony are in litigation, domicile and citizenship are synonymous and may overlap, that is to say, one establishing his residence in Florida for the purpose of securing a divorce, must do so with the bona fide intent to make it permanent and its establishment is a prerequisite to fixing jurisdiction of the court over the subject matter of a divorce suit. Citizenship or domicile may be aided by the place of ones business, profession or trade, where he holds his Church or lodge membership, where one votes and exercises other indicia of citizenship, but all such aids are absent in this case. Ogden was a man of independent means, never had a business, profession or trade, was born a citizen of this country, and has never surrendered his allegiance to it nor applied for citizenship in any other country.

The fact that he has spent most of his life abroad does not ipso facto release his allegiance to this country, including the civic, military and other duties which citizenship imposes. Hundreds of American nationals spend much of their life abroad. In the early history of the country, when travel conditions were poor, our representatives to the various courts of Europe, notably Franklin and Jefferson, spent many years abroad. The children of wealthy planters and merchants were sent abroad at seven and eight to be educated and stayed till they had completed their education in their late teens or early twenties, but they were not citizens of or subject to the duties that citizenship imposes in the countries where they resided. The courts of this state would not assume jurisdiction over nationals of other countries for the purpose of divorce and alimony, and being so, we will not, on the ground of international comity, recognize the judgment of an English Court for that purpose when the essentials of due process, as our law requires, are not observed.

The question of domicile is so important that it determines the Court's jurisdiction of the parties under the law of Florida. If substituted service is relied on to reach the defendant, the statute regulating that must be strictly followed. It does not

appear that there was any order for substituted service on Ogden in the suit for restoration of conjugal rights. The expert testimony shows that even though substituted service had been secured on Ogden in that suit, the judgment would not be entitled to extraterritorial effect. Ogden's special appearance for the sole purpose of raising the question of jurisdiction of his person was dismissed for a reason that had nothing whatever to do with the question of jurisdiction. It alleged that he was a citizen of this country and was domiciled here. The war was on, and there was no possibility of his returning to England in the near future. Mrs. Ogden contends that Ogden's special appearance was dismissed with his knowledge and consent. Ogden denies this and since it is clear that the English Court was on notice of his claim of citizenship in this country, we think the steps shown to acquire jurisdiction of him fall short of legal requirements.

As a clincher to support reversal, appellant relies on Bates v. Bates 53 Nev. 77, 292 Pac. 298 and similar cases. We have given careful consideration to these cases. In the Bates case both parties were English subjects and for the purpose of that case had their marital domicile in England. Bates was in Canada at the time suit for divorce was brought by his wife, and was served with notice there, which, under English procedure, was good as substituted service. In the case at bar, Ogden not only denied being an English subject but claimed his citizenship in this country. He was domiciled in New York when the wife filed her suit to restore conjugal rights, and on account of the war then in progress he could not return to England and contest the question of domicile. Judgment was rendered against him without any consideration to the issue of domicile.

The opinion in Bates v. Bates shows on its face that it was actuated by testimony of English barristers to the effect that the judgment for judicial separation was granted by a court having jurisdiction in person over both spouses, and that so long as it remains in full force in England, it will operate as a bar to plaintiff's subsequent action for divorce there on the grounds stated, that a like judgment of judicial separation rendered in Nevada would be accorded the same effect in Eng-

land, and since there was no showing of fraud, as a matter of comity, the judgment for judicial separation operates as a bar to the plaintiff's action for divorce in Nevada on the ground of cruelty occuring prior to the English decree.

We do not interpret the evidence of the English barristers as to the judgment in the conjugal rights case to have any such effect. Ogden claimed citizenship and domicile in this country. His claim was summarily disposed of and he was denied an opportunity to contest the question of domicile. The English Court did not acquire jurisdiction of his person and stated that his residence in England was not essential. For these and other reasons, the judgment secured against him in England should not, as a matter of international comity, be recognized and given the effect of res adjudicata in the case at bar.

The petition for rehearing is denied and our former judgment of affirmance is adhered to.

THOMAS, C. J., BUFORD and ADAMS, JJ., and PARKS, Associate Justice, concur.

CHAPMAN, J., dissents.