46 So.2d 464 (1950)
PAWLEY
v.
PAWLEY.
Supreme Court of Florida, en Banc.
April 6, 1950.
Rehearing Denied June 9, 1950.
*465 Redfearn & Ferrell and Ward & Ward, Miami, for appellant.
Loftin, Anderson, Scott, McCarthy & Preston, Miami, for appellee.
HOBSON, Justice.
The appellant filed her bill against appellee in the Circuit Court of the Eleventh Judicial Circuit on September 7, 1946. She expressly stated that she "brings this her suit for alimony unconnected with causes of divorce under the provisions of Section 65.10 of the Florida Statutes 1941, F.S.A." She alleged "the defendant since 1939 has been living apart from the plaintiff and the minor children through his own fault * * * that no arrangements have been made by the defendant for the care, maintenance and support of the plaintiff and his minor children * * * that the defendant has made no adequate provisions for the maintenance and support of the plaintiff and minor children" and "that no regular funds have been set except that the defendant has averaged in contributions to the plaintiff for her support and care and maintenance of the large home and for the education, care and support of the minor children a sum of approximately Eight Hundred ($800.00) Dollars per month, which said funds are not adequate even to maintain the home". (Italics ours.) She then asserted that she needs a monthly allowance of $5,000.00.
We will assume that these allegations, coupled with allegations of the defendant's ability to pay and of the standard of living which was apparently set by him, are sufficient *466 to bring her case within the purview of Section 65.10, Florida Statutes 1941, F.S.A.
The appellee by his answer denied the pertinent allegations of the bill and then averred that he had obtained a decree of divorce from appellant which operates as a bar to the instant action for it was entered by a Cuban Court of competent jurisdiction. He asserted affirmatively that the parties were not living separate and apart through his fault and that he had always supported his wife and children  not only adequately but  "most generously". On this subject we quote from his answer, "In addition to the sums advanced directly to W.D. Pawley, Jr., for care, maintenance, upkeep, education, support and pleasures amounting, for the years 1942 to date, to the sum of $15,496.46, the defendant has contributed to the plaintiff for herself and their minor children, by way of cash advances, purchases of personal property and the payment by him of large indebtednesses incurred by the plaintiff without his authority, the following sums of money:

1942 $17,892.58
1943 16,976.82
1944 55,622.69
1945 34,367.49
1946 (To September 8th) 16,445.12
 __________
Total paid 1943-1946 141,304.70[*]
By way of affirmative relief the answer prayed "that the Court will enter a declaratory decree in this cause adjudging and declaring that the decree entered by the Judge of the First Instance for the Western District of the City of Havana of the Republic of Cuba on May 6, 1943, in that certain cause therein pending wherein William Douglas Pawley was plaintiff and Annie Hahr Pawley was defendant, was legal and valid in all respects * * * that the defendant Annie Hahr Pawley, her agents, representatives, attorneys, servants and employees be enjoined and restrained perpetually from attacking the same or challenging the validity thereof in any respect," (italics ours) and that the title to certain real estate particularly described therein be decreed to vest in the appellant and appellee as tenants in common and that said property be partitioned in accordance with the law. The final decree did not adjudicate the question presented by the prayer for partition. Therefore, there will be no further reference to that subject.
Subsequently, appellant filed a motion for leave to amend her bill. The proposed amendment set forth that grounds for divorce existed in favor of appellant and listed as such: desertion, extreme cruelty and adultery. Appellant requested support and/or alimony under the provisions of Section 65.09, Florida Statutes 1941, F.S.A. This motion was properly denied. Still later the appellant filed another motion for leave to amend. By this suggested amendment she proposed that she be granted a divorce upon ground number Eight of the Florida Divorce Statute, Sec. 65.04, Florida Statutes 1941, F.S.A. And again there was a prayer for support and/or alimony as provided in Section 65.09, F.S.A. Subsequently and before the Chancellor had acted upon said motion, counsel withdrew it.
It is contended that under all the facts and circumstances the Cuban divorce amounted to a fraud upon appellant's rights and upon the courts of this State. With this contention we cannot agree. The reasons therefor will become apparent.
The Special Master made among other findings the following: "The proof further shows, however, that the defendant has been voluntarily supporting the plaintiff and their children all through the years amply, and since the acquisition of his so-called fortune, has contributed to their support almost luxuriously. In addition, the testimony taken at the time of the trial showed that he had no intention of cutting the plaintiff off from reasonable support. * * he has at all times up to the present time, as heretofore stated, been furnishing support money to the plaintiff in this cause, and even beyond her needs." (Italics ours.)
The Chancellor restated and confirmed the foregoing findings in the following language:
*467 "That the defendant William D. Pawley has always provided adequately for the support of his former wife, the plaintiff, Annie Hahr Pawley, and even since the rendition of the decree of divorce by the Cuban courts he has contributed regularly to her support and in the aggregate has given to her or paid for her account the sum of approximately $170,000, or an average of more than $25,000 a year. * * *
"That the plaintiff's exceptions to the Master's report be, and the same are hereby overruled and the Master's report is approved and confirmed in all respects."
Section 65.10, Florida Statutes 1941, F.S.A., reads in full as follows: "If any husband having ability to maintain or contribute to the maintenance of his wife or minor children shall fail to do so, the wife, living with him or living apart from him through his fault, may obtain such maintenance or contribution upon bill filed and suit prosecuted as in other chancery causes; and the court shall make such orders as may be necessary to secure to her such maintenance or contribution." (Italics ours.)
The legislature never intended that this statute should abrogate the husband's right to fix the standard of living (within his means and within reasonable limitations) or to cause such prerogative to be usurped by the courts of Florida. In the instant case the standard of living as fixed by the appellee is disclosed by the evidence. So, upon a consideration of the appellant's cause of action as alleged by her, it became appropriate for the Chancellor to determine whether Mr. Pawley was in fact maintaining her and the minor children on such plane. As heretofore shown, the Special Master found that the appellee had at all times provided amply for the appellant's needs, as well as for those of the minor progeny. The Chancellor restated such finding and expressly approved and confirmed all of the Master's findings of facts. Moreover, the Master and the Chancellor in substance determined that the parties were not living separate and apart through his (Pawley's) fault. On the contrary, it was their finding and conclusion that Mrs. Pawley was guilty of constructive desertion as defined by many of our decisions by virtue of the fact that she refused to live with him in China where for business reasons he found it advantageous to live and where he offered to provide a home for Mrs. Pawley. There is substantial, if not conclusive, evidence which sustains the findings as well as that portion of the final decree which ordered the dismissal of the appellant's bill of complaint.
Consequently, the final decree, insofar as it directed the dismissal of the appellant's bill and her cause of action predicated thereon, must be affirmed. Such holding and judgment would be mandatory under our adjudications if there had never been a Cuban divorce. Close v. Close, 158 Fla. 636, 29 So.2d 625; Nelson v. State ex-rel. Quigg, 156 Fla. 189, 23 So.2d 136, and cases therein cited; City of Miami v. Huttoe, Fla., 38 So.2d 819; and Blanchard v. McCord, Fla., 40 So.2d 457. See also Harmon v. Harmon, Fla., 40 So.2d 209.
At this point we are confronted with the question as to whether the Chancellor erred in holding the Cuban divorce valid in all respects and in entering an injunction predicated thereon, perpetually restraining "Annie Hahr Pawley, her agents, representatives, attorneys, servants and employees * * * from attacking the same or challenging the validity thereof."
In a consideration of this question we are constrained to advert again to the findings of facts as made by the Master and restated and/or confirmed by the Chancellor. Those findings, with our observations in brackets, are substantially as follows:
(1) Mrs. Pawley knew of the pendency of the divorce action for she was given personal notice of the existence of the Cuban divorce suit on two separate occasions. Substituted service conformable to the law of Cuba was had upon the appellant. [There is no room for the assertion that there was a failure to accord "due process" unless we should hold that the substituted service reflected by this record, and which tracked Cuban law and had the approval of its court of competent jurisdiction, is inimical to our law or public policy. Further comment upon this subject will be found hereinafter.] *468 However, personal service which could be held to be a legally sufficient predicate for a decree or judgment in personam was not had upon appellant but she had notice and an opportunity to defend.
(2) She chose, as was her privilege, to ignore the suit which was an action wherein the plaintiff sought nothing more than a dissolution of the marriage contract. Pawley did not bring before the Cuban court any question concerning support or alimony, nor did she do so. [Consequently, that Court did not have before it for its determination the issue of Mrs. Pawley's right to alimony.]
(3) Mr. Pawley remarried and the present Mrs. Pawley, on the strength of the Cuban divorce (which was and is legal in that country) acted to her injury if our judgment should be one refusing to recognize and holding invalid the Cuban decree for all purposes. [Furthermore, she is not a party to the instant suit and yet her status or rights will be prejudiced should we fail, under the rule of comity, to recognize the Cuban divorce decree for what it is (i.e. a valid decree of divorce which dissolved the marital status.)] As will be noted hereinafter, the Cuban divorce was predicated upon the ground of desertion. Although the requirement under Cuban law is for a six month period of desertion only, whereas our law requires a twelve month period, the fact remains that the Cuban Court found the desertion of Mr. Pawley by Mrs. Pawley to have existed for a period of more than one year, to-wit: since 1936. The Master and Chancellor in the instant case found that the desertion had been of such character as to meet the requirements of our law. "To actuate the doctrine of judicial comity or reciprocity, the foreign judgment must partake of the elements that would support it if procured in this country." Ogden v. Ogden, 159 Fla. 604, 33 So.2d 870, 874.
The Cuban divorce decree recites the fact that jurisdiction of the divorce suit brought in Cuba by Mr. Pawley was taken under and by virtue of the authority of Article 54 of the Divorce Law contained in Decree Law No. 206, of May 10, 1934, which provides that "Cuban Judges and Courts will take cognizance of divorce suits of foreigners who have contracted marriage outside of Cuba, applying the provisions of the law on the subject, provided the divorce is based, among other causes, on some cause or ground that the national law of the spouses regard as grounds for divorce." The decree proceeds to establish definitely that the ground used by Mr. Pawley was desertion. It correctly stated our statutory ground of desertion, noted the marked similarity between the Cuban law and our law and found and determined that Mrs. Pawley had been guilty of what we call "Constructive desertion" since the year 1936. For the sake of clarity, we quote from the Cuban decree as follows: "That through the testimony adduced, in view of the number and standing of the witnesses examined, it has been shown to be a fact that the spouses have been separated since one thousand nine hundred and thirty six, because of the refusal of the wife to follow her husband, which must be regarded as an act of desertion, in violation of the obligation established by Article fifty eight of the Civil Code, which provides that `the wife is required to follow her husband to the place where he fixes his residence' which obligation was imposed on the defendant wife because a similar obligation is admitted by the jurisprudence of the courts of the country of her nationality."
In the case of Beckwith v. Bailey, 119 Fla. 316, 161 So. 576, 581, this Court speaking through Mr. Justice Davis, said:
"The decree rendered under the last-stated circumstances is not entitled to recognition in Florida in so far as the full-faith and credit provision of the federal Constitution is concerned. * * *
"The decree of the Idaho court may, however, be regarded as valid and recognized in the courts of Florida, and should be so recognized by the law of comity between states, unless there is some good and valid reason to the contrary. See Herron v. Passailaigue, supra [92 Fla. 818, 110 So. 539].
"The Idaho decree of divorce was granted on the ground of cruelty. Extreme cruelty *469 by defendant to complainant is recognized by the laws of Florida as a just cause for divorce. See Sec. 4983, C.G.L., 3191, R.G.S. [F.S.A. § 65.04]. In this case, the record shows that the wife was the moving party in obtaining an Idaho divorce from her husband on the ground of cruelty, and that she obtained such divorce in Idaho predicated upon her alleged Idaho domicile. So the proposition presented to Florida courts for decision is whether or not complainant lawfully obtained the controverted divorce from her husband under Idaho laws, although such divorce was based solely upon constructive or substituted service absolutely binding only in that state, except to the extent that the Idaho decree may be generally given effect and recognized in Florida under the rule of comity, absent any showing that it would be subversive of any Florida policy or interest.
"In the present case it has not been made to appear by the proofs as a matter of law that the public policy, or any salutary interest, of the state of Florida requires the preservation of the pre-existing marital status of Harold O. Bailey with his wife, or that any principle of morality and justice was necessarily violated through the removal of the wife, after her separation from her husband, back to her father's home in the state of Idaho, where she simply took up again a domicile that she had once possessed there before her marriage. This is so even though her purpose in leaving Florida and in resuming her former domicile was ultimately to qualify her for obtaining a divorce decree predicated solely upon constructive or substituted service under the laws of Idaho, her home state.
"Such being the circumstances, the Idaho divorce decree in controversy in this case may be properly recognized as valid under the rule of comity. Especially is this so, in view of the fact that rights of third parties appear to have since intervened to require the recognition, if possible, of said divorce decree as valid under the laws of this state where, on account of the subsequent marriage that has been contracted by the wife on the faith thereof, the status of such erstwhile wife and her present husband, and the rights of others who may have dealt with them as married persons, are likely to be prejudiced if the Idaho decree were captiously disregarded by the courts of Florida." (Italics supplied.)
(4) The appellant withheld action and continued to remain silent for a period of more than three years during which time the appellee contributed adequately  if not lavishly  to the support of the appellant.
(5) In September, 1946, for the first time, the appellant complained to a court of conscience that the appellee had not and was not adequately providing for her support and sought the sum of $5,000 per month, although admitting that he contributed approximately $800 in cash monthly and confessing other contributions towards the maintenance of the home and the children and the payment of many bills contracted by her, which contributions and payments amounted annually to many thousands of dollars. She likewise admitted a cash gift to her on one occasion of $25,000.
(6) The evidence justified the conclusion, and the Master apparently so found, that the appellant now desires to share in the appellee's wealth which was acquired not with, nor by, the appellant's assistance but in spite of her lack of cooperation, for she obviously insisted that he give up his business in the Orient and find employment in or near Miami Beach in which city she preferred to live and she refused to make her home with him in China.
(7) Appellant brought this suit under Section 65.10, Florida Statutes 1941, F.S.A., which provides for alimony unconnected with causes for divorce. She did not see fit to seek a divorce upon Ground No. 8, contained in our divorce statute, which permits a divorce in a situation where the defendant "has obtained a divorce from the complainant in any other state or country," Section 65.04(8), F.S. 1941, F.S.A., although she filed, but subsequently withdrew, a motion for leave to amend her bill by alleging such ground and praying for a divorce and for alimony or support under the provisions of Section 65.09, Florida Statutes 1941, F.S.A.
*470 It has been suggested that if we should recognize the Cuban divorce decree the effect would be tantamount to establishing a principle which would, in all such cases, require a wife residing in Florida to go to a foreign country to defend her rights, or else lose them; and that such a burden is too great to place upon a defending spouse. It is proper for us to be seriously concerned with the possible implication of such a suggestion. We think, however, that the suggestion is more fancied than real, for a three-fold reason: In the first place, if carried to its logical conclusion, such suggestion would result in complete destruction or abrogation of the rule of comity. Secondly, the suggestion is predicated upon the assumption that the marital domicile is in, and that both parties are residents of Florida, which assumption is not tenable for it is not consonant with the facts of the case at bar. The third element is that she should not lose, and the courts should not hold that she would lose, her right to an adjudication of the question of the propriety of an award of alimony if only constructive or substituted service is had upon her. Moreover, with reference to the oppressive burden angle it is appropriate to observe, if the point is at all material, that Havana, Cuba, is nearer to Miami than is Havana, Florida, and certainly it is not as far to Cuba from Miami as it is to our nearest sister state  Georgia.
Be that as it may, the instant case does not present a picture of a long or lifetime resident of Florida suddenly flying to Cuba for a sojourn and securing a hasty divorce with little or no opportunity for the wife to be heard. Pawley lived in Cuba from the approximate age of six until he was about seventeen years of age. Sometime after the marriage of appellant and appellee they made their home in Cuba and actually resided there for a period of several years. Had Mrs. Pawley gone to Cuba and contested the Cuban divorce she would not have occupied the position of a "stranger in a strange land" without friends or money. Pawley testified in this suit that he established the marital domicile and declared it to be in Cuba when he, Annie Hahr Pawley and their children  then in esse  went to that Country in 1927, and that he has never changed it nor intended to do so. [This Court, in the case of Ogden v. Ogden, supra, said: "After all, the best proof of one's domicile is where he says it is."] Cuba, therefore, continued as the marital domicile of the parties and as their place of residence (unless since living separate and apart from Pawley the appellant has changed her place of residence) and has remained so to the exclusion of all other countries in which he or she has lived including this Country. Who can be heard to deny his right to choose, establish and maintain the marital domicile? The answer is, and must be, no one. The appellee was certainly the breadwinner  the head of the family  who in the earliest stages of civilization was granted, and throughout the ages has retained and enjoyed, such prerogative. If it be concluded that he surrendered his Cuban residence after he left that Country and only re-established it in contemplation of the divorce suit, but nevertheless, complied, as the Cuban divorce decree recited that he had, with the Cuban law on the subject of residence, the situation would not differ from that which confronted us in Beckwith v. Bailey, supra.
The jurisdictional prerequisite in both Cuba and the State of Florida is residence  not citizenship  any statement in the case of Ogden v. Ogden, supra, to the contrary notwithstanding. In that case we said: "Under the constitution * * * of this state, when divorce and alimony are in litigation, domicile and citizenship are synonymous and may overlap, that is to say, one establishing his residence in Florida for the purpose of securing a divorce, must do so with the bona fide intent to make it permanent and its establishment is a prerequisite to fixing jurisdiction of the court over the subject matter of a divorce suit." (Italics supplied.)
If that pronouncement is to be taken to mean that in every divorce case and under all circumstances domicile and citizenship are synonymous and if such finding were necessary to the determination of that suit, *471 then we are faced with the application of the doctrine of "stare decisis." Although the writer is a militant advocate of this doctrine, he would not observe it to the point of perpetuating error for the sake of consistency. "Two wrongs do not make a right." It is vastly more important that we be right than that we be pertinacious.
Our statute, 65.02, Florida Statutes 1941, F.S.A., reads, "In order to obtain a divorce the complainant must have resided ninety days in the State of Florida before the filing of the bill of complaint." (Italics supplied.) It is obvious that the word resided could not properly be construed to encompass citizenship in a legal sense because one may come to this State, establish a bona fide residence of ninety days, thereafter institute a divorce action and have it heard and conclusively adjudicated on its merits before he could under the law become a citizen and enjoy all the privileges of citizenship. On the other hand, a person might reside in Florida many years and never become a citizen of this State or renounce his citizenship in a foreign jurisdiction. Indeed, failure to renounce pre-existing citizenship is nothing more than a circumstance to be considered in connection with the question of the bona fides of the plaintiff's residence which is the real test under our statutory law. It is necessary, as provided in 98.01, Florida Statutes 1941, F.S.A., that a person "* * * shall have resided and had his habitation, domicile, home, and place of permanent abode in Florida for one year, and in the county for six months, * * *" (italics supplied) in order to qualify as a voter and for full-fledged citizenship. Citizenship is not a statutory jurisdictional prerequisite for divorce and neither of the words "citizen" or "citizenship" can be read into our statute. Compare Smith v. Voight, 158 Fla. 366, 28 So.2d 426.
Much has been said about the public policy of Florida with reference to the subject of divorce. Some hold the view that such policy is conservative. It is more than difficult for us to understand the logic which causes one to adopt such conclusion in face of the fact that the legislature of this State has seen fit to enact a law containing nine separate grounds for divorce (an unusually large number) and has from time to time reduced the prerequisite residential requirement from a period of two years to ninety days. It is the writer's firm conviction that the public policy as clearly established by legislative action is a liberal one. Almost daily courts of Florida grant divorces to men who have wives in distant states  sometimes in foreign lands. If the statutory requirements of residence, service of process[1] etc. are fully satisfied the divorce is valid, even where  as here  the wife remains silent in some foreign jurisdiction.
Moreover, in this case, as was held to be a fact in Beckwith v. Bailey, supra [119 Fla. 316, 161 So. 581], "It has not been made to appear by the proofs as a matter of law that the public policy, or any salutary interest, of the state of Florida requires the preservation of the pre-existing marital status" of the parties to this suit, "or that any principle of morality and justice was necessarily violated through the removal" of the husband from China or Miami back to the situs of the marital domicile  Cuba. That country had been his place of residence since early childhood and its milieu had become so much a part of him as to cause his school mates in Georgia to attach to him the nickname "Cuba."
Our eighth ground for divorce, reference to which has previously been made, allows a divorce in a case where the defendant has obtained a divorce from the complainant in any other state or country *472 and this, in our opinion, is a definite recognition of a species of "divisible divorce." No less authority than the Supreme Court of the United States has used the expression and approved the doctrine of "divisible divorce." Estin v. Estin, 334 U.S. 541, 68 S.Ct. 1213, 92 L.Ed. 1561, 1 A.L.R.2d 1412; Rice v. Rice, 336 U.S. 674, 69 S.Ct. 751, 93 L.Ed. 957; Kreiger v. Kreiger, 334 U.S. 555, 68 S.Ct. 1221, 92 L.Ed. 1572.
The facts in those cases are not on "all fours" with the facts in the instant suit but as we construe them the principle of law involved is somewhat analogous. Estin v. Estin and Kreiger v. Kreiger clearly establish and uphold the theory of "divisible divorce" although the expression actually used is  "ex parte" divorce. The dissenting opinion by Mr. Justice Jackson in Rice v. Rice, supra, discloses the fact that the "concept of `divisible' divorce" [336 U.S. 674, 69 S.Ct. 754] entered into the picture in the court's consideration of that case. Though the term "divisible divorce" may be obnoxious to some, the fact remains that unless some such concept is applied with respect to divorce decrees secured in foreign jurisdictions on constructive service alone, one of two equally serious and harsh situations will obtain: a divorced wife who for any reason has been unable to appear in the suit of the foreign jurisdiction and present her claim to alimony (although such was not the case here) will be thereafter forever foreclosed from asserting such right, or the courts of this State will be required to decide that "the woman who superseded her" who is not a party to the suit which challenges the divorce decree and who may have become, in good faith, a party to the putative marriage, is, at least in a technical sense, an adulteress. If there should be children as a result of the second marriage, the stigma of illegitimacy would attach and remain with them throughout their lives, innocent though they be.
As we use and understand the term "divisible divorce" it is a vocable which was invented in recognition of the fact that a divorce, strictly speaking, is a dissolution of the marital status and may or may not extinguish all of the obligations of the husband originally created by the common law as incidents thereof, including the duty to support his former wife.
Actually the expression "divisible divorce" is a misnomer. Apparently it was coined by some of the courts because of a want of a more accurate or expressive term without such courts having contemplated the misconception which might be, and evidently has been, placed upon it. In reality the United States Supreme Court in Estin v. Estin, supra, and Kreiger v. Kreiger, supra, did not hold that the parties were only partially divorced. The divorce in each case was recognized by the State of New York as a dissolution of the marital status which met the approval of the United States Supreme Court. Those courts held only that in a divorce action where legally binding personal service had not been had upon the defendant wife and where she had not voluntarily appeared, her right to the enforcement of a prior award of separate maintenance was not destroyed. We hold that the appellant's right to an adjudication concerning the propriety of allowing alimony to her was not foreclosed by the Cuban decree of divorce.
Our ruling in this respect is not dependent upon a determination that the divorce is not absolute or valid as a dissolution of the marital status but rests upon the just and equitable recognition of the fact that the defendant wife under such circumstances has not had her day in court, or an opportunity in truth and in fact to be heard, upon the subject of her right to alimony which (perhaps unlike the inchoate right of dower)[2] is not of necessity *473 destroyed by a divorce decree predicated entirely upon substituted or constructive service. The personal obligation of the husband to support his wife, which devolves upon him at the time of marriage, can survive divorce and ofttimes does, as for example in those divorce actions wherein permanent alimony is awarded. It is not a particularly novel  certainly not an awe inspiring  step to add that the power to adjudicate the former wife's right to permanent alimony (which was not invoked by the appellant or ever, down to this very hour, exercised by any court) also survives a divorce when that divorce is granted without a consideration of the defendant wife's right to alimony and in an ex parte proceeding bottomed only upon constructive service. The Cuban decree declared a dissolution of the "matrimonial bond" (italics supplied) but it could not and did not pass upon appellant's right to an alimony award.
Although the Cuban divorce was a valid dissolution of the contract of marriage it did not operate to destroy one of the incidents of the marriage contract, to-wit: Mr. Pawley's obligation to support his former wife for no question of support or alimony was before the Cuban court. Mrs. Pawley did not voluntarily submit herself to the jurisdiction of that court but substituted service as required by Cuban law was effected. In such a case the court of a foreign country or sister state should be held to have adjudicated only the questions presented to it or those which were implicit in the pleadings and such questions are the only ones which should be considered placed in "perpetual repose." It is only in those cases wherein all parties litigant were personally (actually or by legally sufficient personal service of process) before the court that all justiciable controversies may be said to have been conclusively determined. Even in such cases authority exists for the position that only those matters actually litigated are settled with finality. See Blanchard v. Stribling, 157 Fla. 10, 24 So.2d 713, Headnote No. 4.
If Cuba were one of the States of this Union, the decree of divorce would not have been res judicata as against Mrs. Pawley's claim for support and maintenance. On this point the law is as stated in American Jurisprudence, as follows:
"Section 763. Conclusiveness.  A valid final decree in a divorce suit in one state is res judicata in another state as to the right of the wife to alimony if the court has jurisdiction to grant or deny alimony in divorce proceedings and the question is in issue and is actually heard and determined or is necessarily involved. * * * Thus, if the wife secured her divorce in a state having no jurisdiction over either the person or the property of the defendant clearly its courts did not have the requisite jurisdiction to pass on the question of alimony. Similarly, the doctrine of res judicata does not apply where a court of another state granted the husband a divorce in an ex parte proceeding wherein it acquired no jurisdiction of the person of the wife other than by constructive service." (Italics supplied.) 17 Am.Jur., Divorce and Separation, Section 763, pp. 580-581. See also Peacock v. Peacock, 160 Fla. 630, 36 So.2d 206, headnote #1.
As previously recited, Mrs. Pawley elected to ignore the proceedings in Cuba and to sit by idly, silently and in an attitude of acquiescence until she became under all existing circumstances forever *474 barred by laches and equitable estoppel from questioning the validity of the decree of divorce in so far as it terminated the marital status.
In the case of Herron v. Passailaigue, 92 Fla. 818, 110 So. 539, 542, we said: "The rules of comity may not be departed from, unless in certain cases for the purpose of necessary protection of our own citizens, or of enforcing some paramount rule of public policy." The Cuban court was a court of competent jurisdiction and acquired, for the purpose of determination of the question presented to it, jurisdiction of the parties and it had jurisdiction of the subject matter. The decree of divorce entered by the Cuban court was predicated upon desertion of Mr. Pawley by his former wife. As heretofore stated, the Master and the Chancellor found that Mrs. Pawley had been guilty of "constructive" desertion which constitutes a ground for divorce in this State, as it does under Cuban law. Consequently, the Cuban divorce may and should be recognized under the rule of comity. Comity-courtesy, friendship and goodwill between nations  the only true hope of the confused, distraught, war-sickened and wearied peoples of the earth for permanent peace or for an approximation of Tennyson's idealistic dream of a "One World" as depicted by him in his immortal "Locksley Hall".
"For I dipt into the future, far as human eye could see,
Saw the Vision of the world, and all the wonder that would be;

* * * * * *
Heard the heavens fill with shouting, and there rain'd a ghastly dew
From the nations' airy navies grappling in the central blue;

* * * * * *
Till the war-drum throbb'd no longer, and the battle-flags were furl'd
In the Parliament of man, the Federation of the world.
There the common sense of most shall hold a fretful realm in awe,
And the kindly earth shall slumber, lapt in universal law."
Mr. Pawley was not entitled to invoke our declaratory decree statute for the purpose of securing an adjudication as to the validity of his Cuban divorce and hence it follows that he was not entitled to a decree predicated upon such statute. Compare deMarigny v. deMarigny, Fla., 43 So.2d 442. However, neither his right to affirmative relief by use of the declaratory decree statute nor the validity of the Cuban divorce decree procured by him is a controlling question in this case. Said decree is valid  and stands unimpeached  in Cuba. We have no right, indeed, no power, to declare it invalid. The real questions are (1) whether the Cuban divorce decree should be recognized by the courts of Florida under the rule of comity; (2) whether the Chancellor erred in dismissing the appellant's cause of action. If the decree is recognized, there should be a determination by this Court of the extent of such recognition, and whether it operated as a bar to Mrs. Pawley's suit for separate maintenance under the issues presented by the bill and the defenses directed thereto. We hold that the Chancellor did not err in dismissing the appellant's suit for lack of proof and that the decree should be recognized under the rule of comity for what it is i.e. a dissolution of the marital status.
In view of all the foregoing facts and pronouncements, the Cuban divorce decree should be recognized, under that portion of the answer setting up the decree as a bar to the appellant's suit, as a valid dissolution of the marriage contract in that it cancelled and annulled the obligations of consortium but did not destroy all of the responsibilities of the husband incidental to the contract of marriage and which had attached during the existence of the marriage. Under our view of the case, the decree operated as a bar to the instant suit which is predicated upon Section 65.10, Florida Statutes 1941, F.S.A., but would not preclude an appropriate action by the former wife founded upon Ground No. 8 of Section 65.04, Florida Statutes, 1941, F.S.A., and for relief by way of support *475 or alimony under the provisions of Section 65.08, Florida Statutes of 1941, F.S.A.
The decree from which this appeal was prosecuted is affirmed insofar as it dismissed the appellant's bill of complaint and her cause of action.
That portion of the final decree which held the Cuban divorce to be valid in all respects and which enjoined the appellant, her agents, representatives, attorneys, servants and employees from attacking the same and challenging the validity thereof is reversed with directions that the final decree be modified in such manner as to provide that the Cuban decree of divorce be recognized in this jurisdiction as a valid severance of the bond of matrimony  a dissolution of the marital status  in that it annulled and cancelled the mutual obligation of consortium but that it does not constitute a bar to appellant's right to alimony and to this extent only the decree should be recognized in the State of Florida and by the courts thereof under the rule of comity.
Affirmed in part and reversed in part.
THOMAS and SEBRING, JJ., and BARNS, Associate Justice, concur.
CHAPMAN, J., agrees to the conclusion with opinion.
ADAMS, C.J., and TERRELL, J., dissent.
TERRELL, Justice (dissenting).
The controlling question in this case is whether or not Mr. Pawley's Cuban divorce is entitled to recognition in Florida under the law of judicial comity, otherwise called the Comity of Nations. The majority opinion of Mr. Justice Hobson tenders an affirmative answer to the question bottomed on the "divisible divorce" theory as conceived and promulgated in Estin v. Estin, 334 U.S. 541, 68 S.Ct. 1213, 92 L.Ed. 1561, 1 A.L.R.2d 1412 and Rice v. Rice, 336 U.S. 674, 69 S.Ct. 751, 93 L.Ed. ___.
I do not think the last-cited cases have any application to the case at bar. The majority opinion in both cases was concerned with the application of the full faith and credit clause, Section 1, Article IV, of the Federal Constitution, to judgments of State Courts. In the case at bar, we are concerned with the application of the law of judicial comity to the judgment of a Cuban Court. It is admitted by both parties that the application of the doctrine of judicial comity is entirely different from the application of the full faith and credit clause, that both are governed by different principles and that the latter has no application to this case.
In Rice v. Rice, last cited, the question presented was whether the courts of Connecticut had given full faith and credit to a Nevada divorce decree. The question of "divisible divorce" was not in the picture, was in no way involved, and the majority opinion did not mention it. It is true, that in his dissenting opinion Mr. Justice Jackson took occasion to condemn it for various reasons, some of which will be alluded to later. I have found it mentioned nowhere else in the law books and so far as I am concerned, I think it was a concept incubated to fit the exigencies of the Estin case.
In Estin v. Estin, the main case relied on, the question presented was whether or not a New York decree awarding Mrs. Estin $180.00 per month alimony in a separate proceeding, survived a Nevada divorce decree which was subsequently granted Mr. Estin in another case. It is shown that the decree for alimony was secured by the wife in New York while both spouses were resident there. The husband later secured a divorce in Nevada, the wife not having been notified and did not appear. The husband quit paying alimony after he procured his divorce and the wife sued in New York to recover the amount in arrears. The husband appeared and interposed the Nevada divorce decree as a defense. The highest court of New York upheld the validity of the divorce, but granted the wife judgment for the arrears of alimony. The majority of the Supreme Court of the United States held that the New York judgment, so procured, did not deny full faith and credit to the Nevada divorce.
It was also held that "the result of this situation is to make the divorce divisible  *476 to give effect to the Nevada decree insofar as it affects marital status and to make it ineffective on the issue of alimony. It accommodates the interests of both Nevada and New York in this broken marriage by restricting each State to the matters of her dominant concern." [334 U.S. 541, 68 S.Ct. 1218] In so holding, appellee contends that the doctrine of "divisible divorce" was promulgated. The question before the Supreme Court of the United States, however, was whether or not the New York holding was violative of full faith and credit and that question was answered in the negative.
In the case at bar Mrs. Pawley is attempting to acquire rights secured to her under Section 65.10, Florida Statutes 1941, F.S.A. Mr. Pawley seeks to defeat her claim with a foreign divorce decree. This is quite different from an attempt to overthrow a right previously granted by a court of competent jurisdiction as was done in the Estin case. Section 65.04, Florida Statutes 1941, F.S.A., is also relied on to support the "divisible divorce" theory. The gist of this statute is to create a ground for divorce where the defendant has secured a divorce from the complainant in another state or country. I can see no analogy whatever between such a ground for divorce and the "divisible divorce." Mrs. Pawley is not seeking a divorce, she is seeking alimony or support while defendant is trying to establish the validity of his Cuban divorce to defeat her claim. The concept of "divisible divorce" is not remotely concerned, and so far as the record shows, neither party attempted to bring Section 65.04 into the picture.
The question of "divisible divorce" was not before the chancellor. He disposed of the case on the theory that the Cuban divorce could be given full force and effect in this State on the ground of judicial comity. I know of nothing more fundamental in the law of this country than that one is entitled to have his case tried and disposed of in the appellate court on the same theory that it was disposed of in the trial court. It is equally as fundamental that this Court will not adjudicate questions that were not before the trial court, yet it conclusively appears that both these fundamental concepts were set at nought by the majority opinion.
Another reason that no such concept as "divisible divorce" should be recognized in Florida, is, that the metes and bounds of the divorce law are defined by statute, and when this is the case, it is not for courts to enlarge, reduce or vary the written law in the application of any speculative theory that they may have. It is the duty of courts to construe and declare the law as the legislature pronounces it. When we attempt to construct or add to it, we are no more than meddlers. The law of Florida, Section 65.03, Florida Statutes 1941, F.S.A., recognizes absolute (a vinculo) divorce only. Some states recognize two kinds of divorce, absolute divorce and divorce from bed and board (a mensa et thoro). I have been unable to find any other kind discussed by the text-writers or the case books. The law of this state certainly excludes any other kind, yet the majority opinion rushes in where the legislature has not seen fit to tread and creates a new species of divorce.
It may be that New York recognizes the two well-settled classes of divorce. The Supreme Court in Estin v. Estin recognized the power of the State of New York to define its divorce status and I think when considered in its entirety, the only meaning that can be ascribed to the latter case, is that Nevada had no power to adjudicate the wife's rights under the New York judgment, because she was not personally served and did not appear or in anywise contest the Nevada judgment, and being so, New York was not required to give full faith and credit to the Nevada Judgment. It is not amiss to point out the further holding that the highest court of New York, having held that the award of alimony survived the divorce under New York law, is binding on the Federal Court, unless in conflict with the full faith and credit clause.
Since Estin v. Estin was concerned with the application of the full faith and credit clause to a Nevada judgment by the State of New York, and both the majority and the dissenting opinions in that case were directed to that question, I say again that it can have no application whatever to the *477 question now before the court. There must be some logical relation between the cases and the issues involved to reach the conclusion that one case rules another and there is no such relation here. I think it would be as pertinent to rule it by the law of gravity.
The full faith and credit is a command of the paramount authority to each state to recognize the judgments and decrees of sister states. Judicial comity has to do with the extent to which the law of this country will be enforced in another country or vice versa. Whether the law be a legislative act, judicial decree or an executive order, is not material. It is not a matter of courtesy and good will on the one hand, nor it is a matter of absolute obligation on the other, it is the recognition allowed by one Nation to the legislative, judicial and executive acts of another. It is based on international duty and convenience having due regard to the rights of its own citizens and others who are under the protection of its laws. It is contended by some that the doctrine of judicial comity is one based on paramount moral duty. Hilton v. Guyot, 159 U.S. 113, 16 S.Ct. 139, 40 L.Ed. 95.
The rule is settled in this state that if one would actuate the doctrine of judicial comity, the foreign judgment relied on must partake of the elements that would support it if procured in this country. See Ogden v. Ogden, 159 Fla. 604, 33 So.2d 870; Parker v. Parker, 155 Fla. 635, 21 So.2d 141; and Warren v. Warren, 73 Fla. 764, 75 So. 35, L.R.A. 1917E, 490, in which this question is discussed.
Now let us examine the Cuban divorce and see if it meets the test of good faith, residence requirements, due process and justice to appellant in the manner required by the law of Florida. Suit for the Cuban divorce was instituted in the fall of 1942 and the decree of divorce was entered May 6, 1943. About six weeks later Mr. Pawley was married to his secretary in India. The Cuban divorce was secured without Pawley having returned to Cuba or without having testified therein. There was no attempt to secure constructive service on Mrs. Pawley. It is true that Mr. Pawley's Cuban attorneys attempted to "adjust the Cuban procedure to the American practice as nearly as possible" by sending process to Miami and having it served on Mrs. Pawley by the Sheriff of Dade County. Mrs. Pawley on the advice of counsel ignored the service and we think correctly so, because there was no law authorizing it. The order of the Circuit Court of Dade County directing the Sheriff to make the service was of no force and effect because of absence of any law clothing him with jurisdiction to do so. The Cuban divorce recites that Mrs. Pawley did not appear or become a party to the divorce suit within thirty days as she was required to do by law.
There is no showing that Mrs. Pawley deserted Mr. Pawley. The strongest inference from the evidence is that he voluntarily abandoned her. It is true that after 1929 they spent much time apart, but it was a period in which he was going back and forth from Miami Beach to China where he had a very prosperous business. The war in China was on, it was not good to live there with the family, and both of them preferred to live in Miami Beach where they had a comfortable home and where the children had access to good schools and other social advantages.
Under such a state of facts, there was no such thing as due process accorded Mrs. Pawley in procuring the Cuban divorce, neither was there good faith as contemplated by Parker v. Parker, supra, and a thirty-one day residence in Cuba with the view of establishing citizenship to secure a divorce does not begin to meet the requirement in this state for that purpose. In fact, a careful reading of the record convinces one that Mr. Pawley at no time contemplated establishing his legal residence in Cuba for the purpose of securing a divorce in the manner contemplated by the law of this state.
In the Cuban decree the Court found that Mr. and Mrs. Pawley were both citizens of the United States. It also shows that the Cuban divorce was granted on a ground not recognized by the law of this State. This and the fact that the President of the United States is not in the habit of appointing citizens of other countries to represent this country in such countries as *478 Chile and Brazil as Mr. Pawley was appointed to do would seem to conclusively settle his citizenship status. These facts are revealed from a copy of the Cuban law governing divorce, including a copy of the Cuban divorce decree which were made a part of the record in this case.
The effect of the "divisible divorce" is to end the marital relation, but it is ineffective as to property rights. In this case the divorce is ex parte because Mrs. Pawley was not served and no attempt was made to serve her constructively or otherwise. In Estin v. Estin it was held that the rights of the wife under the New York judgment could not be adjudicated. In Nevada when she was not personally served and did not appear, yet a majority of this Court are upholding Mr. Pawley's foreign divorce when she was not served. The marriage relation is dissolved, but the wife is permitted to pursue the husband in the courts for support. Perhaps the worst effect yet is to confuse the marital relation which has already been confounded to the extent that the most intelligent person is in doubt about what the law is, and the most capable lawyer cannot, with any assurance, tell him what it is. This is the first case in Florida legal history where it was found that alimony, divorce and property status could be settled in separate proceedings and that on ex parte hearing.
The law of Florida requires ninety days bona fide residence before one can apply for a divorce, but under this decision, he can abide in Cuba or Mexico or some other country South of us for thirty-one days, secure a divorce without notice to his wife, proceed home with a new model fraulein and bid the old model to vamoose, notwithstanding she still claims her citizenship here and he says he is a citizen of Cuba. If this constitutes due process, accords justice to a citizen of this country and spells out equal protection, then I confess I have been wrongly tutored as to these concepts. I do not think there is any theory on which "divisible divorce" should be recognized in Florida, and I have always understood that notice and an opportunity to be heard were the very gist of due process. The "crucial issue" in Estin v. Estin, as defined by one of the judges who participated "is whether New York has held that no `ex parte' divorce decree could terminate a prior New York separate maintenance, or whether it has decided merely that no `ex parte' divorce decree of another state could." Can a decision on this question rule the question of comity?
I therefore dissent and am authorized to say that Mr. Chief Justice ADAMS joins in this dissent.
ADAMS, C.J., concurs.
CHAPMAN, Justice (concurring in the conclusion).
The record reflects that the appellee husband has, from time to time, made reasonable financial provisions for the wife and expresses a willingness to support and maintain her in the future. It is possible that he assumed this obligation largely on the theory that the appellant is the mother of his four children and independently of the provisions of Section 65.10, F.S.A. It is my view that the appellee may be required to pay the appellant alimony under the several provisions of Section 65.10, supra. I am unwilling to hold that the "Cuban divorce" is invalid in its application to the second Mrs. Pawley, who is not a party to this suit and has never had her day in court, but married Mr. Pawley in good faith and relying on the legal sufficiency of the Cuban divorce. Hence, I agree to the conclusion reached by Mr. Justice Hobson.

On Rehearing
PER CURIAM.
Counsel for appellant having filed in this cause Petition for Rehearing and having been duly considered, it is ordered by the Court that the said petition be and the same is hereby denied.
THOMAS, SEBRING and HOBSON, JJ., and BARNS, Associate Justice, concur.
ADAMS, C.J., and TERRELL and CHAPMAN, JJ., dissent.
*479 CHAPMAN, Justice (dissenting to order denying Petition for Rehearing).
It is my view that an order should be entered on the Petition for Rehearing which in effect would grant leave and authority to the appellant, Annie Hahr Pawley, to file in this cause, in the court below, within thirty days after the going down of the mandate, an amended bill of complaint which would permit and allow her to prosecute and adjudicate her claims for alimony and all other property rights and disputes now existing between her and William D. Pawley. The appellee, William D. Pawley, should on a day named by the order be required to answer the amended bill and proceed to a final adjudication of all disputes between the parties to this suit.
NOTES
[*] Exclusive of large sums given to William D. Pawley, Jr."
[1] This Court has declared that the purpose of our provision for service by publication and the mailing of notice to the defendant is to make certain, as nearly as possible, that the defendant is apprised of the pending suit  In this case, the Cuban Court knew for a certainty that Mrs. Pawley had notice and it ill behooves us to criticize the substituted service which that Country does and did approve or to hold that it is inimical to our law or public policy upon the subject for such procedure makes the accomplishment of the true purpose of constructive service more definite and certain than does our own.
[2] In this, if not in every jurisdiction, right of dower can never be made the subject of a wholly independent issue in any divorce suit. It stands or falls as a result of the decree which denies or grants divorce. It arises upon marriage, as an institution of the law. The inchoate right of dower has some of the incidents of property. It partakes of the nature of a lien or encumbrance. It is not a right which is originated by or is derived from the husband; nor is it a personal obligation to be met or fulfilled by him, but it is a creature of the law, is born at the marriage altar, cradled in the bosom of the marital status as an integral and component part thereof, survives during the life of the wife as such and finds its sepulcher in divorce. Alimony too is an institution of the law but it is a personal obligation of the husband which is based upon the duty imposed upon him by the common law to support his wife and gives rise to a personal right of the wife to insist upon, if she be entitled to, it. It has none of the incidents of, and is in no sense a lien upon or interest in, property. Consequently, the right of the wife to be heard on the question of alimony should not, indeed lawfully it cannot, be destroyed by a divorce decree sought and secured by the husband in an action wherein only constructive service of process was effected.