656 So.2d 225 (1995)
Glenda NAHAR, individually and Glenda Nahar, as guardian for Catarina Sharisa Nahar, Carlos Sharief Nahar, and Alexander Lucien Nahar, Appellants,
v.
Oral Mildred Jap-A-Joe NAHAR, Kenneth Iwan Nahar, Franceline Cornelia Nahar, Corrine Adeline Nahar, Robert Armand Nahar, and Herman Bertus Nahar, Appellees.
No. 91-1729.
District Court of Appeal of Florida, Third District.
June 7, 1995.
*226 Alfred Aronovitz, Daniels & Talisman, Glen E. Smith, Miami, for appellants.
Cypen & Cypen, Miami Beach, Podhurst, Orseck, Josefsberg, Eaton, Meadow, Olin & Perwin and Joel Eaton, Mark Dienstag, Miami, for appellees.
Sandler, Travis & Rosenberg and Edward M. Joffe and Russell E. Carlisle, as amicus curiae for the International Law Section of the Florida Bar.
Before SCHWARTZ, C.J., and BARKDULL, HUBBART, NESBITT, BASKIN, JORGENSON, COPE, LEVY, GERSTEN, GODERICH and GREEN, JJ.
BARKDULL, Judge.
On motion for rehearing en banc granted, we hereby withdraw our previous opinion dated June 15, 1993, and substitute the following.
Appellant, Glenda Nahar, widow of decedent Roebi Nahar, and the couple's minor children, seek review of a final summary judgment entered in favor of appellees, Roebi Nahar's six adult children by a previous *227 marriage, which ordered transfer of Roebi's six Florida bank accounts to Aruba, in the Netherlands Antilles, to be disposed of in accordance with Dutch law[1] and which ordered payment of administration fees and costs from one of those Florida accounts.
Roebi and Glenda Nahar were married in March of 1977. Prior to their wedding Roebi and Glenda appeared before a Civil Law Notary in Aruba[2] for the purpose of entering into an antenuptial agreement. That agreement provided that no community property would exist between the parties and that each party would keep whatever he or she contributed to or acquired during the marriage.
On May 15, 1984, Roebi, a Surinami national,[3] died intestate in Miami, Florida, U.S.A. Roebi was survived by his widow, Glenda, their three minor children, and six adult children by a prior marriage. At the time of his death, Roebi, Glenda and the couple's three minor children resided in Miami, in a home owned by Roebi and Glenda. Roebi's six adult children resided in Aruba and other Dutch Territories. At the time of Roebi's death, he held six bank accounts in Miami, Florida, with deposits totalling $657,761.28 Dollars U.S.[4] On May 24, 1984, nine days after Roebi's death, Glenda effectively closed five[5] of the six Florida accounts by withdrawing the balances, which totaled $514,345.50.
Roebi's adult children petitioned the Aruban Court of the First Instance to have Roebi's Aruban properties and the Florida bank accounts, but not the Miami real estate, administered under the law of the Netherlands Antilles. The adult children alleged that Roebi and his family only resided in Miami temporarily and that their actual permanent place of residence was in Aruba. Glenda appeared and argued that Roebi was not a domiciliary of Aruba, that Dutch law did not apply and that the Florida accounts were outside any probate proceedings. The Court of the First Instance ordered Glenda to deposit the money from the Florida accounts with a Notary for safekeeping pending settlement of the estate. Glenda failed to comply with this order.
Roebi's adult children then petitioned for ancillary administration in Florida, seeking to have the money from the Florida accounts transferred to Aruba for distribution pursuant to Dutch law.[6] Glenda appeared and argued that the Florida bank accounts and Miami real estate had passed by operation of Florida law to her and her minor children and thus were outside of any probate proceeding. The Florida court stayed the ancillary proceedings pending decision by the Aruban court on the previously filed petition for administration. The adult children then sought to enjoin Glenda from depleting the money from the Florida bank accounts and from disposing of the Miami real estate. The trial court granted an injunction that required Glenda to deposit the money from the Florida bank accounts into the trial court, and prohibited her from disposing of the Miami real estate.
Meanwhile, in the Aruban action, Glenda was ordered to transfer the money from the Florida accounts to Aruba. From that order Glenda appealed, lost and appealed again to *228 The Court of Cassation of the Netherlands.[7] The Hague ruled that Dutch law, not Florida law, controlled Roebi's estate and that the money from the Florida accounts was presumptively an asset of the estate. The Hague remanded the case to the Aruban court for further proceedings.
Glenda then filed a petition, in the Florida action, seeking to revoke probate and both sides moved for summary judgment. Roebi's adult children argued that Glenda was bound by The Hague's decision and that Dutch forced-heirship law was controlling. Glenda argued that Florida law was controlling and that by operation of Florida law the accounts had passed to her and her minor children outside of any probate proceedings. The trial court found The Hague's decision to be res judicata and entered final summary judgment in favor of Roebi's adult children. Thereafter, the trial court ordered that the money from the six Florida bank accounts, after payment of administrative fees and costs incurred in the Florida proceedings, be delivered to Roebi's estate in Aruba to be disposed of in accordance with Dutch law. In order of summary judgment made no express findings regarding the Miami real estate. From that summary judgment Glenda appeals.
We recognize that the final judgments of, and certain interlocutory orders by, the highest court of a foreign nation are entitled to comity. See and compare Metropolitan Investment Corp. v. Buchler, 575 So.2d 262 (Fla. 3d DCA 1991); Cardenas v. Solis, 570 So.2d 996 (Fla. 3d DCA 1990), review denied, 581 So.2d 163 (Fla. 1991); Belle Island Inv. Co., Ltd. v. Feingold, 453 So.2d 1143 (Fla. 3d DCA), cause dismissed, 459 So.2d 1039 (Fla. 1984); Restatement (Second), Conflict of Laws, § 98 (1988). See also § 732.702, Fla. Stat. (1991). But see Sanchez v. Sanchez De Davila, 547 So.2d 943 (Fla. 3d DCA), review denied, 554 So.2d 1168 (Fla. 1989) (distinguishable due to the antenuptial agreement between deceased and his future wife); § 655.55 Fla. Stat. (1988).[8]
This court, in Cardenas v. Solis, 570 So.2d 996 (Fla. 3d DCA 1990), stated that:
[I]t is well settled that, as a general rule, only the final judgments of courts of a foreign country are subject to recognition and enforcement in this country, provided certain jurisdictional and due process standards are observed by the foreign court; non-final or interlocutory orders of foreign courts, however, are generally not entitled to such recognition or enforcement. See Restatement (Second) Conflict of Laws § 98 comment c (1971).
Cardenas, at 998 (citations omitted) (restatement revised in 1988; comment c moved to comment d).
Nonetheless, the Cardenas court held that a Guatemalan temporary injunction issued in a domestic relations case would be enforced under principles of comity because it was one of the "limited exceptions to the general rule" and because enforcement could be based upon "compelling public policy reasons." Id., at 999. The Cardenas court then enunciated two areas where foreign interlocutory orders should be recognized: (1) creditors rights and (2) spousal and childrens' rights in a domestic relations case. Id., at 999. Accordingly, the Cardenas decision left substantial room under the principles of comity, for a foreign decree that is less than final to be acknowledged or ignored. Implicitly the Cardenas decision established a rule requiring the court to analyze each foreign order on a case by case basis prior to granting comity. It seems however that, rather than trying to analyze each foreign order on the basis of whether it is final and entitled to *229 comity, non-final not subject to an exception and not entitled to comity, or non-final subject to an exception and entitled to comity, the better approach is to follow the Restatement (Second), Conflict of Laws, approach in it entirety.[9]
Sections 92 & 98 of the Restatement suggest that almost all foreign decrees should be granted comity:
§ 98. RECOGNITION OF FOREIGN NATION JUDGMENTS
A valid judgment rendered in a foreign nation after a fair trial in a contested proceeding will be recognized in the United States so far as the immediate parties and the underlying claim are concerned.
Comment:
a. Valid Judgment. The rule of this Section is limited to valid judgments, that is, to judgments which meet the requirements of § 92... .
To aid the reader in determining which "judgments" are to be considered "valid" and thus entitled to comity the Restatement states:
§ 92. REQUISITES OF A VALID JUDGMENT
A judgment is valid if
(a) the state in which it is rendered has jurisdiction to act judicially in the case; and
(b) a reasonable method of notification is employed and a reasonable opportunity to be heard is afforded to persons affected; and
(c) the judgment is rendered by a competent court; and
(d) there is compliance with such requirements of the state of rendition as are necessary for the valid exercise of power by the court.
Comment:
a. Meaning of "judgment." As used in the Restatement of this Subject, "judgment" is a general term which includes not only judgments at law but also the orders, injunctions or decrees of equity courts, and the judgments of probate courts, admiralty courts and other special courts... .
Consequently, it appears that any foreign decree should be recognized as a valid judgment, and thus be entitled to comity, where the parties have been given notice and the opportunity to be heard, where the foreign court had original jurisdiction and where the foreign decree does not offend the public policy of the State of Florida. See and compare Hilton v. Guyot, 159 U.S. 113, 16 S.Ct. 139, 40 L.Ed. 95 (1895); Tahan v. Hodgson, 662 F.2d 862 (D.C.Dist. 1981). We find the Restatement (Second), Conflict of Laws, § 98 (1988) to be the better approach when determining whether a foreign decree is entitled to comity and recede from Cardenas to the extent that it conflicts with this holding.
The trial court properly granted comity to the Dutch court's order which held that Roebi was a domiciliary of Aruba and that his estate was governed by Dutch law. Administration of an estate is governed by the law of the decedent's domicile, See Biederman v. Cheatham, 161 So.2d 538 (Fla. 2d DCA), cert. denied, 168 So.2d 146 (Fla. 1964), and the forum will apply its own rules in determining the person's domicile prior to determining the applicable substantive law. See Restatement (Second), Conflict of Law, § 13; see and compare Mississippi Choctaw Indians v. Holyfield, 490 U.S. 30, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989) (citing restatement for proposition that domicile is determined according to law of the forum); Texas v. Florida, 306 U.S. 398, 59 S.Ct. 563, 83 L.Ed. 817 (1939). The Dutch court had the power to determine Roebi's domicile and upon doing so, to determine the substantive law that would apply to Roebi's estate. We note that it is uncontroverted that the Dutch court had jurisdiction in this matter. Glenda had notice and opportunity to be heard, in *230 fact she contested the issue to the highest court of the land. Where a party has had notice and opportunity to be heard and the foreign court has satisfied Florida's jurisdictional and due process requirements their orders will be entitled to comity.[10]See Cardenas; Restatement (Second), Conflict of Laws, § 98 (1988); see also Watts v. Swiss Bank Corp., 27 N.Y.2d 270, 317 N.Y.S.2d 315, 265 N.E.2d 739 (1970) (French court's judgment applying French law to New York joint bank account entitled to comity).
The trial court erred in failing to specifically address the Miami real estate in its order of summary judgment. While Roebi's personal and intangible property may be governed by the judgment of the Aruba court, the Miami real estate may be subject to a different result. We remand this matter to the trial court to resolve any issues regarding the disposition of the Miami real estate in the first instance.
We find no error in the trial court's order charging the marshaled assets with the cost incurred in marshaling same. See Nahar v. Nahar, 576 So.2d 862 (Fla. 3d DCA 1991); In re Estate of Katz, 501 So.2d 68 (Fla. 3d DCA 1987); Perez v. Lopez, 454 So.2d 777 (Fla. 3d DCA 1984). The trial court properly ordered the Administrator Ad Litem to pay these expenses from the assets of Roebi's estate.
We hold that the trial court erred in finding the AmeriFirst "Totten Trust" to be under the jurisdiction of the Dutch court. This account was not the subject of dispute in the Dutch action, Glenda was not on notice that Roebi's adult children laid claim to this account, nor was it the subject of any order by the Dutch court which would be entitled to comity.[11] Further, we hold that this account was a true trust account which vested upon Roebi's death and, as the parties properly concede, the money from this account passed to the trust's beneficiaries according to the terms of that trust. See Seymour v. Seymour, 85 So.2d 726 (Fla. 1956); First Nat'l Bank of Tampa v. First Fed. Sav. & Loan Ass'n of Tampa, 196 So.2d 211 (Fla. 2d DCA 1967).
Accordingly the final summary judgment under review is affirmed in part, reversed in part and remanded to the trial court for further proceedings consistent with this opinion.
Affirmed in part, reversed in part and remanded with instructions.
SCHWARTZ, C.J., and NESBITT, COPE, LEVY, GERSTEN, GODERICH and GREEN, JJ., concur.
HUBBART, Judge (concurring in part, dissenting in part).
By today's decision, the court holds, first, that a widow and her three minor children have no personal property rights in (a) two Totten trust bank accounts set up by her deceased husband prior to his death at the Peninsula Savings and Loan Association in Miami, Florida, under which, in written documents filed with the bank, she and her husband were joint trustees and her three minor children were trust beneficiaries; and (b) three joint commercial bank accounts set up by her deceased husband prior to his death at the Coconut Grove Bank in Miami, Florida, under which, in written documents filed with the bank, she had a right of survivorship to the funds in said account upon her husband's death. The court reaches this result based on its determination that comity must be given to a Dutch court's interlocutory order in an ongoing probate proceeding of the deceased husband's estate in Aruba, which was opened by the husband's adult children from a prior marriage and over which the Dutch court has personal jurisdiction of the widow. In this interlocutory order, *231 it was decided that (i) the husband was a domiciliary of Aruba (and only a temporary resident of Florida) at the time of his death in Florida, and (ii) the husband's estate is governed by Dutch law, not Florida law, with respect to the husband's Florida property. Under Dutch "forced heirship" law, the proceeds of the Florida bank accounts are presumptively probatable assets of the deceased husband's estate, notwithstanding the ownership of same by the widow and her minor children under Florida law. Accordingly, the court affirms a trial court order which directs that the proceeds of these accounts be turned over to the Dutch court in Aruba to dispose of as the Dutch court sees fit, as no final determination of ownership rights has been made with respect to these accounts.[1]
Secondly, the court holds that a widow and her three minor children do have personal property rights in a Totten trust bank account set up by her deceased husband prior to his death at the AmeriFirst Savings and Loan Association in Miami, Florida, under which, in written documents filed with the bank, the deceased husband was the sole trustee and the widow and her three minor children were the trust beneficiaries. The court reaches this result based on its determination that (a) this account is not the subject of dispute in the ongoing Dutch probate proceeding in Aruba as the adult children have not laid claim to that account and no order which is entitled to comity has been issued by the Dutch court with respect to this account, and (b) the proceeds of this trust account passed under Florida law to the widow and her three minor children upon the death of the husband. Accordingly, the court reverses a trial court order directing that the proceeds of this account be turned over to the Dutch court with directions that said proceeds be transferred to the widow and her three minor children.
Finally, the court holds that the trial court (a) erred in failing to specifically address the real estate held by the deceased husband and the widow in Miami, Florida, at the time of the husband's death upon a determination that the disposition of this property may not be governed by Dutch law as is true of the Peninsula and Coconut Grove bank accounts discussed above, and (b) did not err in its order charging the above bank accounts with the cost of marshaling the proceeds of same.
I agree entirely with the court as to its second and third holdings, but regret that I cannot join the court's first holding. In my view, (1) Florida law, not Dutch law, governs the disposition of all the bank accounts in this case, not just the AmeriFirst Totten trust and Florida real estate, based on the controlling Florida conflict-of-laws rule governing joint bank accounts and Totten trusts; (2) comity principles, relied on by the court to reach a contrary conclusion, are totally inapplicable, and, indeed, are expressly forbidden, in determining the applicable conflict-of-laws rule, and (3) Florida law dictates that the widow and her three minor children are the owners of these accounts, as the proceeds of same passed by operation of law to them upon the death of the husband.

I
My fundamental disagreement with the court on the first holding, as stated above, is centered around which law governs the disposition of the Peninsula Totten trusts and the Coconut Grove joint accounts. The court concludes that Dutch law governs based on an application of comity principles, which means that presumptively the proceeds of these accounts are probatable assets and belong to the deceased's estate under Dutch "forced heirship" law [although there are exceptions thereto which the Dutch courts are still sorting out]. I think Florida law governs, which means, as will be demonstrated *232 later, that the proceeds of these accounts pass by operation of law to the widow and her three minor children. Indeed, this is the pivotal issue of the instant case, the resolution of which can only be determined by reference to Florida's applicable conflict-of-laws rule because it is well-settled that, subject to exceptions not relevant here, the law of the forum governs in determining which conflict-of-laws rule is applicable in a given case.[2]

A
Turning, then, to the applicable Florida conflict-of-laws rule, it is established in Florida, as well as throughout the country, that the disposition of a joint bank account, including a Totten trust, is governed by the law of the situs of the account, regardless of the domicile of any party to the account; in particular, this rule has been applied where, as here, the proceeds of that account are subject to conflicting claims, as here, by (1) a surviving joint depositor or account beneficiary and (2) the executor of the estate of a deceased joint depositor or account trustee in a Florida or foreign probate proceeding. In Seng v. Corns, 58 So.2d 686 (Fla. 1952), the Florida Supreme Court held that in a Florida probate proceeding, the law of Illinois governed the disposition of a joint bank account located in an Illinois bank, and that, accordingly, the surviving joint depositor was entitled to the proceeds of that account, not the executor of the deceased joint depositor whose estate was being probated in Florida. The Court stated:
"The Circuit Court [below] held that under the Statutes of Illinois, and construing the deposit contract before it under the Illinois decisions, the survivor of two joint depositors in an Illinois bank took legal title to the deposit and could not be required to deliver the funds to the Florida executor of the deceased joint depositor, no matter which joint depositor furnished the money so deposited. We agree."
Id. at 687. Not only did the Court apply the law of the situs of the joint bank account (Illinois) in determining that the proceeds of the subject account passed under Illinois law to the surviving joint depositor, it also implicitly concluded that this result was not changed by the fact that the estate of the deceased joint depositor was being probated in Florida  a result that is flatly contrary to the court's determination in the instant case which applies the law of the jurisdiction where the estate of the deceased joint depositor is being probated (Aruba), instead of the law of the situs of the joint bank account (Florida) which Seng requires.
In Lieberman v. Silverstein, 393 So.2d 565 (Fla. 3d DCA 1981), this court held that the law of New York governed the disposition of two joint bank accounts located in New York in a Florida suit by the surviving joint depositor against the widow of the deceased joint depositor to recover the proceeds of a bank certificate of deposit [CD] which the deceased joint depositor had purchased with funds he withdrew from the joint accounts; under New York law, this court concluded that the surviving joint depositor impliedly *233 consented to or ratified the subject withdrawal and that the deceased joint depositor's widow was entitled to the CD. Relying on Seng, the court stated:
"It is clear that New York law governs the rights of the parties to a jointly held bank account located there and therefore controls the issues involved in this case."
Id. at 566 n. 2. Clearly, then, under Florida law the disposition of a joint bank account is governed by the law of the situs of the account.
Moreover, this court has held in Sanchez v. Sanchez De Davila, 547 So.2d 943 (Fla. 3d DCA), rev. denied, 554 So.2d 1168 (Fla. 1989) [a case virtually identical to the instant case], that in an ancillary probate proceeding, as here, the law of Florida governed the disposition of a Totten trust bank account located in Florida so that upon the death of the trustee under the account, the proceeds of the account passed by operation of law to those children of the deceased who were beneficiaries of the account  and that the "forced heirship" law of Venezuela, where the deceased trustee's estate was being probated just like the instant case, did not govern, so that those children of the deceased who were not beneficiaries of the account had no right to the proceeds of same. Relying on Seng and Lieberman, this court stated:
"It is well settled in Florida that the disposition of a joint bank account, including a Totten trust, is governed by the law of the situs of the account regardless of the domicile of any party to the account.

....
In the instant case, the subject Totten trust bank accounts are located in a bank in Miami, Florida, and accordingly Florida law must govern their disposition  even though (a) Venezuela is the domicile of the decedent who created the trusts, and (b) Venezuelan law is contrary to Florida law on the disposition of the trusts when, as here, the creator of the trusts dies. Moreover, under Florida substantive law, it is undisputed that the beneficiaries of a Totten trust are entitled to the proceeds of the subject bank account upon the death of the creator of the trust. Plainly, then, the appellant sons, as the beneficiaries of the subject Totten trust, are entitled to the funds of the said trusts  not all the children of the deceased as the trial court ruled [under Venezuelan "forced heirship" law]."
Id. at 945 (citations omitted) (emphasis added). The court's decision in the instant case to apply Florida law to the disposition of the AmeriFirst Totten trust located in Miami, Florida, is fully consistent with this decision; the same result is equally dictated with respect to the Peninsula Totten trusts and the Coconut Grove joint accounts also located in Miami, Florida, and the court's decision to the contrary is in clear conflict with Sanchez.
Moreover, the Florida conflict-of-laws rule on the disposition of joint bank accounts and Totten trusts, in an estate context and otherwise, is in accord with the law of many other jurisdictions:
"The courts seem to agree that title of and rights in a bank deposit standing in the names of the depositor `and' another is governed by the law of the place where the deposit has been made and the account is kept.

Thus, the question whether a deposit made by a deceased person in the names of the deceased or the plaintiff or the survivor of them created a joint tenancy, with the right of the survivor to take upon the death of the other, was held to be governed by the law ... where the deposit was made, and not by the law ... where the will of the deceased was proved... ."
E.H. Schopler, Annotation, Joint Bank Accounts-Governing Law, 25 A.L.R.2d 1240, 1241-42 (1952) [hereinafter Schopler] (emphasis added) (citations omitted).
Section 655.55(1), Florida Statutes (1991), codifies this conflict-of-laws rule as to bank accounts located in Florida:
"The law of this state, excluding its law regarding comity and conflict of laws, shall govern all aspects, including without limitation the validity and effect, of any deposit account in a branch or office in this state of a financial institution ... regardless of the citizenship, residence, location, or domicile of any other party to the contract or agreement governing such deposit account, *234 and regardless of any provision of any law of the jurisdiction of the residence, location, or domicile of such other party, whether or not such deposit account bears any other relation to this state...." (emphasis added).
"Deposit account," as employed in the above statute, is specifically defined to include, as here, "any deposit or account in one or more names including, without limitation, any ... joint account ... or Totten trust account." § 655.55(3)(b), Fla. Stat. (1991). Because this statute codifies an existing Florida conflict-of-laws rule as stated in prior case law, it is not surprising  and, indeed, appears perfectly fair  that the statute is expressly made both prospective and retroactive, to wit: "this section applies to deposit accounts ... entered into before, on, or after July 1, 1988," the effective date of the statute. § 655.55(6), Fla. Stat. (1991). Consequently, the statute is clearly applicable to the joint bank accounts and Totten trusts involved in this case as they were, without dispute, "entered into before ... July 1, 1988." § 655.55(6), Fla. Stat. (1991).[3]
Without question, then, the applicable Florida conflict-of-laws rule, as established by both prior case law and the above statute, is that the disposition of a joint bank account, including a Totten trust, is governed by the law of the situs of the account, regardless of the domicile of any party to the account; this rule, in turn, has been applied where, as here, the estate of a deceased joint depositor is being probated in a foreign jurisdiction. Seng; Lieberman; Sanchez; Schopler; see § 655.55, Fla. Stat. (1991).

B
The centerpiece, however, of the court's refusal to apply Florida law [in accord with the applicable Florida conflict-of-laws rule] to the Peninsula Totten trusts and Coconut Grove joint accounts is the court's decision to grant comity to an interlocutory order entered by the Dutch court in Aruba that the husband was domiciled in Aruba at the time of his death and therefore his estate must be governed by Dutch law, rather than Florida law. This order is one of a series of interlocutory orders which have been entered by the Dutch trial and appellate courts in Aruba and the Netherlands in a complicated, on-going probate of the deceased husband's estate in Aruba in which, admittedly, no final determination concerning the ownership of the subject bank accounts [particularly the Coconut Grove accounts] has been made by the Dutch courts. The court states:
"The trial court [in Florida] properly granted comity to the Dutch court's order which held that Roebi [the husband] was a domiciliary of Aruba and that his estate was governed by Dutch law. Administration of an estate is governed by the law of the decedent's domicile, See Biederman v. Cheatham, 161 So.2d 538 (Fla. 2d DCA), cert. denied, 168 So.2d 146 (Fla. 1964), and the forum will apply its own rules in determining the person's domicile prior to determining the applicable substantive law. *235 See Restatement (Second), Conflict of Law, § 13; see and compare Mississippi Choctaw Indians v. Holyfield, 490 U.S. 30, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989) (citing restatement for proposition that domicile is determined according to law of the forum); Texas v. Florida, 306 U.S. 398, 59 S.Ct. 563, 83 L.Ed. 817 (1939). The Dutch court had the power to determine Roebi's [husband's] domicile and upon doing so, to determine the substantive law that would apply to Roebi's estate. We note that it is uncontroverted that the Dutch court had jurisdiction in this matter. Glenda [the widow] had notice and opportunity to be heard, in fact she contested the issue to the highest court of the land. Where a party has had notice and opportunity to be heard and the foreign court has satisfied Florida's jurisdictional and due process requirements their orders will be entitled to comity. See Cardenas; Restatement (Second), Conflict of Laws, § 98 (1988); see also Watts v. Swiss Bank Corp., [27 N.Y.2d 270,] 317 N.Y.S.2d 315[, 265 N.E.2d 739] (N.Y. 1970) (French court's judgment applying French law to New York bank account entitled to comity)."
656 So.2d at 229-230 (emphasis added).
The fundamental flaw in this analysis, however, is that comity principles are totally inapplicable in determining what conflict-of-laws rule should be followed in a given case. As previously noted, the law of the forum, exclusive of comity law, governs in determining which conflict-of-laws rule is applicable to a given case because it is considered a rule of procedure, subject to limited exceptions not applicable here. See supra note 1 and accompanying text. Beyond that, Section 655.55(1), Florida Statutes (1991), expressly prohibits the application of comity principles when determining, as here, the disposition of a joint bank account and Totten trust located in Florida. The statute provides that "[t]he law of this state, excluding its law regarding comity..., shall govern all aspects ... of any deposit account in a branch or office in this state of a financial institution ...," which "deposit account" is defined to include, as here, "any ... joint account ... or Totten trust account." § 655.55(1)(3), (b), Fla. Stat. (1991). Yet the court has done precisely what the statute forbids when it gives comity to the Dutch court order holding that Dutch law governs the disposition of the Peninsula and Coconut Grove bank accounts.
Nor is it of any moment that the husband's estate is being probated in Aruba, that the husband was domiciled in Aruba at the time of his death, or that the Dutch courts have personal jurisdiction over the widow and have ruled against the widow as to what law governs these accounts. In the abstract, these factors may arguably be important in determining whether to give comity to the judgments of a foreign jurisdiction, but, as previously explained, comity principles are inapplicable to this case, as the law of the forum governs, exclusive of comity law, in determining what conflict-of-laws rule to apply in a given case, see supra note 1 and accompanying text. And our applicable conflict-of-laws rule requires us to apply the law of Florida, exclusive of comity principles, to the disposition of these accounts regardless of the domicile of any party to the account or whether the estate of one of the account depositors is being probated in a foreign jurisdiction[4]. § 655.55, Fla. Stat. (1991); Seng; Sanchez.
In any event, the court, in my judgment, does not really give comity to any decree of *236 the Dutch court in Aruba because it does not order the widow or her minor children to transfer any of the proceeds of the Peninsula Totten trusts or Coconut Grove accounts to a third party in accord with such a decree. Instead the court inappropriately gives "comity" to a Dutch court interlocutory order that Dutch law governs the disposition of the subject accounts and then turns the proceeds of the accounts over to the Dutch courts to do whatever they wish in accord with Dutch law, inasmuch as no decree has yet been entered disposing of the proceeds of these accounts. This is clearly not giving comity to the decree of a foreign jurisdiction as there is no decree to give comity to, but is instead an impermissible transfer of jurisdiction to the courts of a foreign country to enter an in futuro decree.[5]
Plainly, then, comity principles are inapplicable to this controversy as the case is controlled *237 by the Florida conflict-of-laws rule that the disposition of a joint bank account, including a Totten trust, is governed by the law of the situs of the account  Florida law [exclusive of comity law] for the subject Florida accounts  regardless of the domicile of any party to the account or whether the estate of any party to the account is being probated in a foreign jurisdiction. Indeed, the court concedes this to be true with respect to the AmeriFirst Totten trust as well as, impliedly, the Florida real estate; the same result should obtain with respect to the Peninsula Totten trusts and the Coconut Grove joint accounts as well.

II
Turning now to the applicable Florida law governing the disposition of all the bank accounts involved in this case, it is clear beyond any hope of successful contradiction that the proceeds of these accounts passed to the widow and her three minor children upon the death of her husband. Moreover, there is no monetary claim which has been reduced to judgment by any court to which the proceeds of these accounts could be attached in satisfaction of judgment; to the contrary, no monetary claim has been filed in Aruba or here against the widow or her three minor children. Consequently, the proceeds of all the Florida bank accounts herein should be transferred to the widow and her three minor children.

A
It is well settled in Florida that the beneficiaries of a Totten trust bank account are, by operation of law, entitled to the proceeds of the subject bank account upon the death of the depositor/trustee.[6] Moreover, we have held that this result is not changed by the fact that the estate of the trustee, as here, is being probated in a foreign jurisdiction where the trustee was domiciled at the time of his death, and the foreign jurisdiction has a "forced heirship" law which presumptively makes the proceeds of such an account probatable assets.[7]

1
It is therefore clear that under Florida law the proceeds of the Totten trust set up by the deceased husband at the AmeriFirst Savings and Loan Association passed by operation of law to the beneficiaries of the trust, i.e. the widow and her three minor children, upon the death of the trustee husband. In this connection, the parties' antenuptial agreement does not obviate this otherwise inevitable result, as there is utterly no provision in the agreement precluding the husband from setting up a trust for his wife or children. To the contrary, Article III of the agreement expressly obligates the husband to provide for the education of his children, which duty the husband carried out by setting up the Totten trust; nor does the agreement prohibit either party, as here, from making a gift causa mortis to one another. The conclusion is therefore inescapable that under Florida law the widow and her three minor children became the owners of this account upon the death of the husband; indeed the court expressly so holds, as any *238 decision to the contrary would be inconsistent with the result reached by this court in Sanchez v. Sanchez De Davila, 547 So.2d 943 (Fla. 3d DCA), rev. denied, 554 So.2d 1168 (Fla. 1989), based on virtually identical facts.

2
The result is slightly different, however, with respect to the two Totten trusts set up by the husband at the Peninsula Savings and Loan Association for the benefit of the three minor children. Unlike the AmeriFirst Totten trust, the Peninsula Totten trusts name the husband or the widow as joint trustees; consequently, upon the death of the husband, the proceeds of these accounts did not pass by operation of law to the beneficiaries of the trusts, to wit: the three minor children, because there is still one living trustee, the widow, on these accounts. The widow, however, upon becoming the sole trustee of these Totten trusts upon the husband's death, had the undoubted power under Florida law to revoke such trusts at any time during her lifetime. Seymour v. Seymour, 85 So.2d 726 (Fla. 1956). Consequently, when the widow closed these accounts subsequent to the husband's death, she was entirely authorized to do so under Florida law, and, accordingly, the proceeds of this account belong to her.[8]

B
It is equally well settled under Florida law that in a joint commercial bank account with right of survivorship, the person or persons creating such account "shall be presumed to have intended that upon the death of any such person all rights, title, interest, and claim in, to, and in respect of such deposits and account and additions thereto ... less all proper setoffs and charges in favor of the bank, shall vest in the surviving account holder or holders," § 658.56(1), Fla. Stat. (1983), which presumption "may be overcome only by proof of fraud or undue influence or clear and convincing proof of contrary intent." § 658.56(2), Fla. Stat. (1983).
"In the absence of such proof, [however,] all rights, title, interest, and claims in, to, and in respect of such deposits and account and the additions thereto .. ., less all proper setoffs and charges in favor of the bank against any one or more of any such persons, shall, upon the death of such person, vest in the surviving account holder or holders ... notwithstanding that the provisions hereof may constitute or cause a vesting or disposition of property or rights or interests therein, testamentary in nature, which, except for the provisions of this section, would or might otherwise be void or voidable."
§ 658.56(2), Fla. Stat. (1983).
In the instant case, it is undisputed that the husband set up three commercial bank accounts at the Coconut Grove Bank in the name of himself and the widow, with joint right of survivorship. Upon the husband's death, the proceeds of these accounts passed by operation of law to the widow as, in effect, a valid testamentary disposition [or perhaps more accurately a valid gift causa mortis] under Section 658.56, Florida Statutes (1983), unless the statutory presumption that the husband/decedent intended such disposition is overcome by "proof of fraud or undue influence or clear and convincing proof of a contrary intent." There is utterly no evidence in this record that the husband was fraudulently induced or was subjected to undue influence or otherwise did not intend to set up the joint accounts and set up the subject testamentary disposition. Moreover, as previously noted, there is nothing in the antenuptial agreement entered into by the parties to prevent such a testamentary disposition by one party to another, as here, because the agreement does not even deal with the subject. It is therefore clear that the statutory presumption of the deceased husband's intent was not overcome in this case, and that, under Florida law, the proceeds of these joint accounts, with right of survivorship passed by operation of law as a virtual testamentary disposition to the widow.

III
In sum, then, I concur in the court's reversal of the trial court order under review *239 relating to the proceeds of the AmeriFirst Totten trust; I agree that the proceeds of this account should be transferred to the widow and her three minor children as the beneficiaries of this Totten trust account in accord with applicable Florida law. I also concur with (a) the court's reversal of the subject trial court order for failing to address the real estate held by the husband and the widow in Miami, Florida, at the time of the husband's death, as the disposition of this property should also be governed by Florida law; and (b) the court's affirmance of the trial court order charging the subject bank accounts with the costs of marshaling the proceeds of same.
I dissent, however, from the court's affirmance of the trial court order requiring that the proceeds of the Peninsula Totten trusts and the Coconut Grove joint accounts be turned over to the Dutch court in Aruba to dispose of as such court sees fit in accord under Dutch law. Like the AmeriFirst Totten trust, I would reverse this aspect of the subject order as well and remand with directions that the proceeds of these accounts be transferred to the widow in accord with Florida law.
BASKIN and JORGENSON, JJ., concur.
JORGENSON, Judge, dissenting.
I agree with Judge Hubbart that Florida law controls the disposition of the Coconut Grove joint accounts and the Peninsula Totten Trusts. I write separately, however, to express my view that this case presents an exception to the rule of comity, and that the Florida probate court had no ancillary jurisdiction over these bank accounts.
"[C]omity is the practice by which one court follows the decisions of another court on a like question, though not bound by the law of precedence to do so... . [T]he rules of comity `may not be departed from unless in certain cases for the purpose of the necessary protection of [Florida] citizens or of enforcing some paramount rule of public policy.'" Berger v. Hollander, 391 So.2d 716, 719 (Fla. 2d DCA 1980) (emphasis added) (quoting Herron v. Passailaigue, 92 Fla. 818, 110 So. 539 (1926)). Florida courts have long recognized the confusion engendered by joint bank accounts, and the survivorship issues that arise upon the death of the depositor. See, e.g., In re: Estate of Combee, 601 So.2d 1165 (Fla. 1992); In re: Estate of Gainer, 466 So.2d 1055 (Fla. 1985). Statutes regulating these accounts used to be described as "designed primarily to regulate banks, and ... not generally conclusive of the ownership of deposited money." Seymour v. Seymour, 85 So.2d 726, 727 (Fla. 1956). However, "statutes of this kind have been expanded beyond their original bank protection purpose so that they now contain provisions touching upon ownership in joint accounts... . Those statutes were said to be intended to eliminate uncertainties surrounding survivorship rights." Drozinski v. Straub, 383 So.2d 301, 305 (Fla. 2d DCA 1980) (emphasis added). Individuals who open joint accounts or Totten Trusts in Florida should enjoy the certainty that the disposition of their funds in those accounts will be governed by the laws of Florida, and not by the vagaries of a distant tribunal. Even under Florida's comity doctrine foreign decrees must bow to this state's legislative and judicial pronouncements of public policy relating to the establishment of survivorship rights. In my view, the public policy implicated in this case overrides the judicial discretion to grant comity. Under Florida law, therefore, the funds in these accounts pass directly to the widow and do not become part of the decedent's estate.
NOTES
[1] Dutch law, synonymously known as the law of the Netherlands, is the controlling law on the island of Aruba in the Netherlands Antilles.
[2] An Aruban court official.
[3] Surinam is a dependency of the Netherlands.
[4] The six bank accounts at issue in this action break down into three categories; three Coconut Grove Bank accounts which were originally established by Roebi individually and which were later converted to the joint ownership of Roebi and Glenda with joint right of survivorship; two Peninsula Federal Savings and Loan accounts which were established in the name of Roebi or Glenda in trust for their three minor children; and, one AmeriFirst Federal Savings and Loan account which was established as a "Totten Trust" in trust for Glenda and the couple's three minor children with Roebi as trustee.
[5] Five of the accounts were held by Roebi and Glenda either jointly or as trustees, the sixth bank account was a "Totten Trust" and as Glenda was not a trustee, she was unable to withdraw those funds.
[6] According to Dutch law, Glenda and all nine children are entitled to share in Roebi's property equally; each would thus receive a one-tenth part share of the estate.
[7] The Court of Cassation, the highest court of the Netherlands and its possessions, is located in the Hague and is commonly referred to as "The Hague."
[8] We hold that § 655.55, Florida Statutes (1988), is not applicable to accounts established and closed before the effective date of the statute in 1988, particularly, where the deceased depositor died in 1984. Even if § 655.55, Florida Statutes, was applicable, the depositor, through his successor, was in litigation regarding the ownership of the accounts on the effective date of the statute, and subsection (6) of § 655.55 provides for rejection of the provisions of the statute by the depositor. Litigation between the depositor and/or their agents on the effective date of the statute was certainly written evidence of rejection of same.
[9] The courts of this state regularly seek guidance from the Restatement. See Continental Mortg. Inv. v. Sailboat Key, Inc., 395 So.2d 507 (Fla. 1981) (citing the Restatement (Second), Conflict of Laws, § 203 Comment b); Mobil Oil Corp. v. Shevin, 354 So.2d 372 (Fla. 1977) (citing the Restatement (Second), Conflict of Laws, § 2 Comment a); Hopkins v. Lockheed Aircraft Corp., 201 So.2d 743 (Fla. 1967) (citing the Restatement, Conflict of Laws, § 379); Kellogg-Citizens Nat'l Bank of Green Bay, Wis., v. Felton, 145 Fla. 68, 199 So. 50 (1940) (citing the Restatement, Conflict, of Laws § 612).
[10] Although the validity and enforceability of the Nahar's antenuptial agreement is not at issue, we note with approval the recent decision of the Fourth District, In re Estate of Nicole Santos, 648 So.2d 277 (Fla. 4th DCA 1995) in which it was determined that lex loci contractus governs the rights and liabilities of the parties to an antenuptial agreement.
[11] Although, the Dutch courts, in dicta, did discuss this account in their opinions, this court is only required to grant comity to orders of foreign courts, and we decline the invitation to extend comity to a foreign court's dicta.
[1] Without dispute, there is no Dutch court decree, final or interlocutory, which distributes some or all of the proceeds of any of the bank accounts involved in this case as part of a probate accounting of the husband's estate; to the contrary, the entire estate proceeding is still in litigation in Aruba. Indeed, as to the Coconut Grove accounts, the Dutch courts have not even determined whether the proceeds of these accounts are probatable assets of the husband's estate, as these courts are still in the process of sorting out this issue under Dutch law. The Supreme Court of the Netherlands at The Hague has, in fact, remanded the cause to the courts in Aruba to decide this issue according to the standards established in the Supreme Court's opinion.
[2] "A court applies the law of its own state, as it understands it, including its own conception of Conflict of Laws. It derives this law from the same sources which are used for determining all its law: from constitutions, treaties and statutes, from precedent, from considerations of ethical and social need and of public policy in general, from analogy, and from other forms of legal reasoning." Restatement (Second) of Conflict of Laws § 5 cmt b (1971). "A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law." Restatement (Second) of Conflict of Laws § 6(1) (1971). "Whenever state, and not federal, law is applicable to a given case, the choice-of-law rule determining which state's law is to be used, ordinarily is a rule of the law of the forum... . Exceptions are choice-of-law rules contained in international conventions to which the United States is a party and which bind the states under the U.S. Constitution's Supremacy Clause and occasional provisions of federal law." Eugene Scoles and Peter Hay, Conflict of Laws § 3.1, at 50, 50 n. 2 (1982). "The basic theory of the common law of Conflict of Laws is that ... the forum's own procedural rules are always applied... . For one thing, the law of Conflicts of Laws is itself procedural law. It is usually, but not always, the law of Conflicts of Laws of the forum that is applied ... [e]xcept in instances where the renvoi principle is applicable." Robert R. Leflar, Conflict of Laws § 60, at 109-10, 110 n. 3 (1959). The "renvoi" principle, in turn, is applicable where the forum's conflict of laws rule requires that the law of a foreign jurisdiction be applied, but the conflict of law rule of the foreign jurisdiction requires that the law of the forum be applied. Id. § 6, at 9-10.
[3] Without any cited authority or stated reasons, the court, however, holds that this statute "is not applicable to accounts [as here] established and closed before the effective date of the statute in 1988, particularly, where the deceased depositor died in 1984." 656 So.2d at 228 n. 8. This is clearly an erroneous interpretation because there are no exemptions stated in the statute for accounts opened and closed before July 1, 1988 or for accounts where one of the depositors died before July 1, 1988; the statute, without reservation, applies to "deposit accounts entered into ... before July 1, 1988," § 655.55, Fla. Stat. (1991), regardless of whether the account is later closed or where one of the depositors later dies.

The only express exemption provided for in the statute states that "this section shall not apply to any deposit accounts existing on July 1, 1988, if either party to the contract or agreement governing the deposit account provides the other party with a written objection to the application of this section within 6 months of July 1, 1988." § 655.55(6), Fla. Stat. (1991) (emphasis added). Obviously, this exemption is inapplicable to the accounts involved in the instant case because, without dispute, these accounts did not exist on July 1, 1988, having been closed prior thereto. Accordingly, the court's fall-back holding that  "[e]ven if [section] 655.55, Florida Statutes, was applicable [to the accounts in the instant case]," the above exemption was nonetheless applicable on the theory that "the depositor, through his successor, was in litigation regarding the ownership of the accounts on [July 1, 1988] the effective date of the statute" and such litigation "was certainly written evidence of rejection of same" 656 So.2d at 228  is clearly wrong; overlooked in this holding is that the entire exemption only applies to accounts, unlike the instant case, which existed on July 1, 1988.
[4] As an aside, the court's statement that the "[a]dministration of an estate is governed by the law of the decedent's domicile," 656 So.2d at 229 is not supported by the cited authority [Biederman v. Cheatham, 161 So.2d 538 (Fla. 2d DCA), cert. denied, 168 So.2d 146 (Fla. 1964)], and clearly is an overstatement which the court itself does not follow, as it (1) applies Florida law to the AmeriFirst Totten trust, and (2) strongly implies that Dutch law may not govern the disposition of the parties' jointly held real estate in Miami, to wit: "the Miami real estate may be subject to a different result" and "may not be governed by the judgment of the Aruba court." 656 So.2d at 230. Moreover, in Seng v. Corns, 58 So.2d 686 (Fla. 1952), the Florida Supreme Court applied Illinois law to a joint bank account located in Illinois in a Florida probate proceeding involving presumably a Florida domiciliary; and in Sanchez v. Sanchez De Davila, 547 So.2d 943 (Fla. 3d DCA), rev. denied, 554 So.2d 1168 (Fla. 1989), this court applied Florida law to Totten trusts located in Florida, rather than the law of Venezuela where the estate of one of the deceased joint depositors [a Venezuelan domiciliary] was being probated.
[5] A major part of the court's opinion is devoted to creating a new rule of comity which is contrary to the established law and is based on a misunderstanding of the Restatement (Second) of Conflict of Laws. The court holds that "any foreign decree [whether final or interlocutory] should be recognized as a valid judgment, and thus be entitled to comity, where the parties have been given notice and the opportunity to be heard, where the foreign court had original jurisdiction and where the foreign decree does not offend the public policy of the State of Florida." 656 So.2d at 229. This holding is used as a predicate to its later decision to give "comity" to the interlocutory Dutch court order announcing that Dutch law governs the disposition of the bank accounts involved in this case, an inappropriate application of comity principles.

This holding, however, is contrary to the Florida Supreme Court's decision in Ogden v. Ogden, 159 Fla. 604, 33 So.2d 870 (1947), which refused to give comity in a divorce action to an English court order entered in a suit to restore conjugal rights because the order was non-final in nature. The Court stated:
"We do not understand the rule of international comity to require the courts of this country to recognize and give effect to the judgments of an English court that are not final. If permitted to reason by analogy, it may be said that such is the effect of the full faith and credit, clause of the Constitution of the United States as to the judgments of other states."
Id. 33 So.2d at 874. It is also contrary to our decision in Cardenas v. Solis, 570 So.2d 996, 998-99 (Fla. 3d DCA 1990), rev. denied, 581 So.2d 163 (Fla. 1991), which, in an extensive analysis of the relevant international law authorities on the subject, followed the Ogden holding as a general rule, but recognized certain exceptions thereto, not relevant here.
The court expressly refuses to follow the Cardenas holding, and implicitly goes in conflict with Ogden, based on a misunderstanding of Sections 92 and 98 of the Restatement (Second) of Conflict of Laws (1971, as revised 1988). Section 98 states that a "valid judgment" of a foreign nation will be recognized in the United States; Section 92, in turn, defines a "valid judgment" of a sister state in the United States as one which satisfies certain jurisdictional and due process prerequisites, a definition which is expressly adopted by Section 98 at comment a, and therefore applies to foreign nations as well. Comment c of section 92, however, states that "[s]uch judgments ... are entitled to recognition and enforcement ... except as stated in §§ 103, 107-121;" Section 107 of the Restatement (Second) of Conflict of Laws (1971), in turn, states: "A judgment will not be recognized or enforced in other states insofar as it is not a final determination under the local law of the state of rendition"; comment a to section 107 also states that "[T]he rule of this section applies to non-final judgments, whether at law or in equity, as opposed to modifiable judgments... ." It is therefore abundantly clear that Sections 92 and 98 of the Restatement (Second) of Conflict of Laws apply solely to final determinations of rights in final judgments, and are inapplicable to interlocutory orders which do not finally determine the rights of the parties. If there was any doubt as to the position of the American Law Institute on this subject, it was laid to rest by Section 481 of the Restatement (Third) of Foreign Relations (1987), which states that, subject to certain jurisdictional and due process prerequisites, "a final judgment of a court of a foreign state granting or denying recovery of a sum of money, establishing or confirming the status of a person, or determining interests in property, is conclusive between the parties, and is entitled to recognition in the United States."
The court, however, walks away from all this law and requires Florida courts to enforce any interlocutory foreign court order which satisfies certain basic jurisdictional and due process prerequisites. This new rule is bound to create enormous confusion and instability in future cases because now a Florida court must enforce an otherwise valid interlocutory order which is not a final determination of rights and which may be changed in a subsequent valid interlocutory order which will also have to be enforced in Florida. This result is totally contrary to the rationale against generally enforcing such interlocutory orders, as stated in comment b of Section 107 of the Restatement (Second) of Conflict of Laws (1971) [which generally precludes the enforcement of foreign interlocutory orders]  namely, "[a] judgment will not be given greater effect abroad than it enjoys at home. A judgment will not have the force of res judicata in the state of rendition as to issues that remain subject to final determination. The judgment should neither be recognized nor enforced in other states as to such issues." Moreover, we have further stated that "the underlying reasons" behind this general rule is that "it would be an undue burden for American courts to become entangled in the otherwise unfamiliar intricacies of foreign court practice by recognizing or enforcing the temporary court orders of another country, orders which are subject to being vacated, withdrawn or superseded." Cardenas v. Solis, 570 So.2d 996, 998 (Fla. 3d DCA 1990), rev. denied, 581 So.2d 163 (Fla. 1991). Henceforth, however, Florida courts will have to become involved in the intricacies of frequently unfamiliar foreign court practice and enforce valid interlocutory orders which may be later vacated, withdrawn or superseded by the foreign court, which subsequent interlocutory orders will also have to be enforced  thereby creating, in my view, enormous instability, confusion and unfairness. Consequently, I would adhere to the contrary rule established in Ogden, the Restatement (Second) of Conflict of Laws, the Restatement (Third) of Foreign Relations, and as extensively analyzed in Cardenas, which recognizes, as a general rule, only final judgments and decrees of a foreign jurisdiction, subject to limited exceptions.
[6] Seymour v. Seymour, 85 So.2d 726, 727 (Fla. 1956); Sanchez v. Sanchez De Davila, 547 So.2d 943, 945 (Fla. 3d DCA), rev. denied, 554 So.2d 1168 (Fla. 1989); In re Solnik's Estate, 401 So.2d 896, 897 (Fla. 4th DCA 1981).
[7] Sanchez v. Sanchez De Davila, 547 So.2d 943 (Fla. 3d DCA), rev. denied, 554 So.2d 1168 (Fla. 1989).
[8] As previously noted, the antenuptial agreement did not prohibit the husband from setting up a trust fund, as here, for his children; nor did the agreement prevent the widow from serving as a co-trustee of the trust.